# 25-0253-cv

## United States Court of Appeals
*for the*
## Second Circuit

ZUHTU ONUR TATARI,

*Petitioner-Appellee,*

– v. –

NEVA DURUST,

*Respondent-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR RESPONDENT-APPELLANT
## AND SPECIAL APPENDIX

BRETT S. WARD
ANDREW T. HAMBELTON
BLANK ROME LLP
*Attorneys for Respondent-Appellant*
1271 Avenue of the Americas
New York, New York 10020
(212) 885-5000

CP COUNSEL PRESS   (800) 4-APPEAL • (376563)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT REGARDING ORAL ARGUMENT .............................................. vi

JURISDICTIONAL STATEMENT ............................................................ 1

ISSUE PRESENTED FOR REVIEW ......................................................... 1

STATEMENT OF THE CASE ................................................................ 2

FACTUAL BACKGROUND AND PROCEDURAL HISTORY ........................................ 5

    A.     The Parties and the Divorce Decree ........................................ 5

    B.     Appellant's Custodial Rights Under Turkish Law .............................. 7

    C.     The Turkish Court Proceedings ............................................. 9

    D.     Appellant's Move to New York and Subsequent Turkish Litigation .............................................................. 11

    E.     This Hague Convention Action and the District Court's Order ......... 12

SUMMARY OF ARGUMENT ................................................................. 13

STANDARD OF REVIEW ................................................................... 16

ARGUMENT ............................................................................. 16

    I.     HAGUE CONVENTION LEGAL STANDARD ............................................. 16

    II.    THE DISTRICT COURT ERRED BY OVERRULING PRIOR TURKISH COURT ORDERS DECIDING THAT APPELLEE DID NOT HAVE ANY CUSTODIAL RIGHTS UNDER TURKISH LAW ............................................... 18

        A.     The District Court Improperly Discounted the Turkish Court's Repeated Rejections of Appellee's Requests to Prevent Appellant from Relocating with the Child, Not Merely Traveling ........................................................ 19

            1.     Appellee First Sought Custodial Rights from the Turkish Court in January 2024 and the Turkish Court Rejected that Request ........................................... 20

2.      Appellee Next Sought to Restrict Appellant's
        Right to Relocate with the Child Abroad in July
        2024 and the Turkish Court Rejected That
        Request ..............................................................21

3.      The November 2024 Order Reaffirmed the
        Turkish Court's Opinion that Appellant Has Sole
        Custody and Can Relocate Without Appellee's
        Approval .............................................................26

B.      The District Court Order Improperly Overruled
        Dispositive Decisions of the Turkish Court In Violation
        of the Central Tenants of the Hague Convention ....................27

III.    THE DISTRICT COURT ERRED IN FINDING THAT THE
        DIVORCE DECREE GAVE APPELLEE CUSTODIAL
        RIGHTS .................................................................................31

IV.     THE DISTRICT COURT ERRED IN FINDING THAT THE
        DIVORCE PROTOCOL PROVIDES APPELLEE WITH
        CUSTODIAL RIGHTS .........................................................34

A.      The Divorce Protocol Does Not Confer Custodial
        Rights on Appellee Because it is Not a Court Order ...............34

B.      The District Court Improperly Created Custodial
        Rights that Do Not Exist Under Turkish Law ..........................37

V.      THE DISTRICT COURT ERRED IN DECLINING TO
        APPLY ARTICLE 15 OF THE HAGUE CONVENTION ...............45

CONCLUSION .......................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbott v. Abbott*,
    560 U.S. 1 (2010) ................................................................ 17, 28, 40

*Aluker v. Yan*,
    No. 21-1279, 2021 WL 3417968 (4th Cir. Aug. 5, 2021)............................ 42, 43

*Barzilay v. Barzilay*,
    600 F.3d 912 (8th Cir. 2010) ......................................................... 29-30

*Chafin v. Chafin*,
    568 U.S. 165 (2013) ................................................................. 19

*De Vasconcelos v. De Paula Batista*,
    No. 4:10-CV-00628, 2011 WL 806096 (E.D. Tex. Mar. 1, 2011) ..................... 35

*Diorinou v. Mezitis*,
    237 F.3d 133 (2d Cir. 2001) ......................................................... 30

*Gitter v. Gitter*,
    396 F.3d 124 (2d Cir. 2005) ......................................................... 17

*Livingstone v. Livingstone*,
    No. 22-1308, 2023 WL 8524922 (10th Cir. Dec. 8, 2023) ............................ 44

*Lozano v. Alvarez*,
    697 F.3d 41 (2d Cir. 2012),
    *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) ....................... 16

*Miller v. Miller*,
    240 F.3d 392 (4th Cir. 2001) ........................................................ 30

*Ohlander v. Larson*,
    114 F.3d 1531 (10th Cir. 1997) ................................................. 17-18, 30

*Ozaltin v. Ozaltin*,
    708 F.3d 355 (2d Cir. 2013) ................................................. 17, 25, 30, 46

*Palencia v. Perez*,
    921 F.3d 1333 (11th Cir. 2019) ...................................................... 42

*Pereira v. Gunter*,
No. 2:23-CV-5-ECM-JTA, 2024 WL 733896 (M.D. Ala. Feb. 22, 2024),
*report and recommendation adopted*, No. 2:23-CV-5-ECM,
2024 WL 1095739 (M.D. Ala. Mar. 13, 2024), *appeal dismissed*,
No. 24-11162-Q, 2024 WL 4541529 (11th Cir. July 12, 2024)..........................44

*Pfeiffer v. Bachotet*,
No. 1:18-CV-03446-RWS, 2018 WL 9563334
(N.D. Ga. Aug. 29, 2018), *aff'd*, 913 F.3d 1018 (11th Cir. 2019) ............... 40, 41

*Pignoloni v. Gallagher*,
555 F. App'x 112 (2d Cir. 2014).........................................................................16

*Radu v. Toader*,
805 F. Supp. 2d 1 (E.D.N.Y. 2011),
*aff'd,* 463 F. App'x 29 (2d Cir. 2012) ..................................................... 40, 41, 43

*Shealy v. Shealy*,
295 F.3d 1117 (10th Cir. 2002) ..................................................................... 28, 29

*Slight v. Noonkester*,
No. CV 13-158-BLG-SPW, 2014 WL 282642
(D. Mont. Jan. 24, 2014).....................................................................................42

*Souratgar v. Lee*,
720 F.3d 96 (2d Cir. 2013) ............................................................................ 28, 30

*Takeshi Ogawa v. Kyong Kang*,
946 F.3d 1176 (10th Cir. 2020) ............................................................. 17, 40, 43

*Trott v. Trott*,
No. 20-CV-1392 (AMD) (CLP), 2020 WL 4926336
(E.D.N.Y. Aug. 21, 2020) ...................................................................................30

*White v. White*,
718 F.3d 300 (4th Cir. 2013) .......................................................... 24, 36, 42, 43

## Statutes & Other Authorities:

22 U.S.C. § 9001 ...................................................................................................1

22 U.S.C. § 9003(a) ...............................................................................................1

22 U.S.C. § 9003(e)(1).........................................................................................17

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1331 ...................................................................................1

Hague Conf. on Private Int'l Law, 1980
    CHILD ABDUCTION CONVENTION –
    COUNTRY PROFILE: TURKIYE (2023) .........................................45

Hague Convention, Article 3 ............................................ 19, 28, 40, 45

Hague Convention, Article 5 ..............................................................17

Hague Convention, Article 15 ........................................................ *passim*

Turkish Civil Code Art. 182 ...............................................................31

Turkish Civil Code Art. 184/5 ......................................................35, 36

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is necessary because this case presents important issues of law and fact, including the interpretation of foreign law, affecting the well-being of a child. Oral argument will significantly aid the Court in understanding the record and deciding the issues on appeal.

<u>*/s/ Brett S. Ward*</u>
Brett S. Ward

## JURISDICTIONAL STATEMENT

Petitioner-Appellee, Zuhtu Onur Tatari ("Appellee") filed a Petition in the Eastern District of New York pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980 (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et seq.* seeking to have his son with Respondent-Appellant, Neva Durust ("Appellant") returned to Turkey. The District Court had jurisdiction under 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction).

This appeal arises out of the District Court's (Amon, J.) Memorandum and Order dated January 29, 2025 (the "Order") and Judgment dated February 3, 2025 (the "Judgment"), which granted Appellee's Petition. On February 3, 2025, Appellant timely filed a Notice of Appeal of the Order and Judgment. This Court has jurisdiction pursuant to 28 U.S.C.A. § 1291.

## ISSUE PRESENTED FOR REVIEW

1. Did the Lower Court err in finding that Appellant wrongfully removed the child from Turkey under the laws of the state of habitual residence, Turkey? **Yes. The Lower Court erred in finding that Appellant wrongfully removed the child under Turkish law.**

## STATEMENT OF THE CASE

This is a case where a United States District Court tasked with making findings about custodial rights in a foreign jurisdiction unilaterally disregarded multiple decisions by the foreign jurisdiction on the very issue before the District Court. Respondent-Appellant Neva Durust ("Appellant") respectfully requests that this Court reverse the United States District Court for the Eastern District of New York's (Amon, J.) Memorandum and Order dated January 29, 2025 (the "Order") and Judgment dated February 3, 2025 (the "Judgment"), finding that Appellant's removal of the child, O.T., (the "Child") from Turkey was wrongful and granting Appellee's Petition for the return of the Child to Turkey.

The evidence at trial established that: (i) the parties' divorce decree dated January 19, 2022 (the "Divorce Decree") awarded sole custody of the Child to Appellant; (ii) during the final divorce proceeding, Appellee acknowledged to the Turkish divorce judge that he knew the Divorce Decree gave Appellant sole custody, that Appellant had the right to relocate abroad with the Child without his consent, and that his only remedy if he disagreed with Appellant's relocation with the Child was to move for a change of custody; (iii) Appellee repeatedly acknowledged that Appellant had sole custody; (iv) Turkish Law provides that sole custody means a parent can relocate with the Child without the other parent's consent; and (iv) the Turkish Court has repeatedly ruled in a manner consistent

with Appellant having sole custody, including in July 2024, when the Turkish Court specifically ruled (in response to a motion by Appellee to bar Appellant from relocating with the Child) that Appellant has the absolute right to relocate abroad with the Child.

In light of these facts, most notably the Turkish Court's July 2024 ruling, the District Court's Order concluding that the Appellee has custodial rights under the Hague Convention is unsupported by the record and contrary to both Turkish law and the Turkish Court's prior decisions. The Turkish Civil Code only provides for sole custody. While Turkish case law has recognized joint custody rights due to international treaty, it only applies in limited circumstances in which the parties expressly agree to joint custody by explicitly using the language "joint custody." The Divorce Decree does not provide for joint custody, as it clearly states that Appellant has sole custody of the Child. Furthermore, the Turkish Civil Code does not provide any *ne exeat* right for parents.

The Divorce Decree is clear that Appellee's only remedy if he does not approve of Appellant's relocation with the Child is to move for a change of custody in the Turkish Courts—he does not have the right to block Appellant from moving abroad with the Child. Consistent with the Divorce Decree's award of sole custody to Appellant, Appellee sought a change of custody when he did not agree with Appellant's decision-making. Appellee did not make an application to the

Turkish Court for enforcement of the Divorce Decree terms or to direct Appellant to return to Turkey with the Child because he did not have the right to do so under the Divorce Decree.

Thus, the District Court's Order created custodial rights for Appellee that do not exist in the Divorce Decree or Turkish Law. Under these circumstances, the District Court's finding that Appellee had a *ne exeat* right is reversible error and undermines a critical principle of the Hague Convention—that custody determinations made in other countries and the law regarding custodial rights in those countries must be respected. Otherwise, every litigant could forum shop to a different country to obtain custodial rights that were not given to them in their home country—which is precisely what the Hague Convention is designed to prevent.

In the alternative, Appellant asks this Court to remand to the District Court and require that Appellee ask the Turkish Courts to decide the question of whether Appellant violated Appellee's custodial rights at the time Appellant moved to the United States with the Child under Article 15 of the Hague Convention.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. The Parties and the Divorce Decree

The parties were married in January 2016. (App.[1] 364). They have one Child in common, O.T., born in Florida in 2018. (App. 364, 509). The parties intentionally chose to have the Child in the United States because they always planned to relocate to America. (App. 509).

The parties divorced on January 19, 2022, and attended a hearing in the Turkish Court on that date. (App. 583). The Divorce Decree was issued on February 11, 2022. (*Id.*). The Divorce Decree includes the Turkish Court's Order that was made the day of the divorce hearing. (App. 584).

As part of the divorce process, the parties agreed on a divorce protocol (the "Divorce Protocol"), which represented the agreement between the parties prior to the divorce hearing. (App. 366, 512). The Divorce Protocol is annexed to the Divorce Decree. (App. 585-87).

In November 2023, prior to any dispute between the parties over the relocation of the Child, Appellant obtained a translation of the Divorce Decree, prepared and stamped by a Turkish government-approved notary, Talat Yacizi. (App. 704, 515-16). In August 2024, Appellant obtained another copy of the English translation and

---

[1] References to "App." refer to the Joint Appendix submitted herewith. References to SPA refer to the Special Appendix submitted herewith.

a notary again certified that the original English translation she received was accurate. (App. 583, 518-19).

The Divorce Decree is divided into several sections. The first is a recitation of what the judge considered in rendering the decision (App. 583), akin to the background section of an American court opinion. The next section contained the Turkish Court's order. (App. 584). This section was followed by an annexation of the Divorce Protocol—the parties' agreement prior to the divorce proceeding. (App. 585-87).

The first section of the Divorce Decree memorializes that, during the divorce hearing, Appellee admitted to the Turkish judge: "*I understand that the [Appellant] may legally make decisions at h[er] sole discretion in line with h[er] custodian rights, including material decisions about the child's healthcare and moving his residence to abroad.* I am still willing to seek a decision for non-contentious divorce; however, *I reserve my right to bring a lawsuit to ensure the alternation (change) of custody unless I am consulted by the [Appellant] and give my approve as agreed with the defendant in the protocol.* (App. 583 (emphasis added)).

The second section—the Turkish Court's order—states the Court "ORDERED, ADJUDGED AND DECREED . . . THAT Neva Dürüst Tatari, the mother, be appointed as the custody of [O.T.] the biological child of the Parties . . . pursuant to Article 182 of TCC." (App. 584). Here, the Divorce decree clearly

- 6 -

awards sole custody to Appellant.

The annexed Divorce Protocol contains additional provisions that Appellee has improperly asserted provide him with joint custody, including Section 3.7., which states, "3.7 Neva DÜRÜST TATARI irrevocably agrees, represents and undertakes that where she decides to live abroad together with the biological child, she will consult and seek the opinion of Zühtü Onur TATARI." (App. 586). Section 4.2 of the Divorce Protocol states that the Divorce Protocol was approved and annexed to the Divorce Decree, but it is not part of the Court's Order in the second section of the Divorce Decree. (App. 587).

## B. Appellant's Custodial Rights Under Turkish Law

Under the Turkish Civil Code, only one parent is granted custody of a child in a divorce. (App. 219, 263, 456). The Turkish Civil Code only recognizes sole custody to avoid a situation where the child is in the middle of a dispute between the parents. (App. 456).

While not included in the Turkish Civil Code, joint custody has recently been recognized by Turkish Courts, but in very limited circumstances. (App. 828, 624). Both parties' experts on Turkish law acknowledged that joint custody is only granted in "exceptional cases" and that courts in Turkey are "reluctant" to approve joint custody. (App. 457, 286, 624). Joint custody will only be recognized in a divorce if the language is explicit—it must expressly state that the parties have joint custody.

(App. 491). Dr. Emehran Inal, an expert in Turkish family law, explained that it should be "as clear as the daylight" if a divorce decree provides for joint custody. (App. 459). The Divorce Decree between the parties does not state anywhere that the parties have joint custody. (App. 583, 593, 704, 849).

As the Divorce Decree itself makes clear, the Judge specifically issued only two orders following the parties' divorce proceeding: (1) a visitation schedule for Appellee and (2) that Appellant had sole custody of the Child. (App. 584). No aspects of the parties' Divorce Protocol, including Section 3.7, were included in the section containing the orders by the Turkish Court. (*Id.*)

All the legal experts who testified at trial agree that, if a parent has sole custody, then under Turkish law, that parent has the sole ability to make decisions regarding where the child lives, including the decision to move abroad with the child over the objection of the non-custodial parent. (App. 465-66, 225, 286, 494, 619, 830-32). Thus, because Appellant was given sole custody of the Child in the Divorce Decree, she was permitted under Turkish law to relocate abroad with the Child without Appellee's consent. (*Id.*).

The Turkish legal experts also consistently explained that the remedy for the non-custodial parent to object to the custodial parent relocating abroad with a child without consent of the non-custodial parent is for the non-custodial parent to seek a change of custody. (App. 285; 466, 619-20). As reflected in the Divorce Decree,

Appellee expressly acknowledged to the presiding judge at the divorce proceeding that if he disagreed with any of Appellant's decisions, including her right to relocate with the Child, he could apply to the Turkish Court for a change of custody. (App. 583). And this is exactly what Appellee did.

### C. <u>The Turkish Court Proceedings</u>

There were a number of decisions in the Turkish Court between the parties that are highly relevant to, if not outcome determinative of, this action.

On January 30, 2024, Appellant began a case in Turkey to change the custody of the Child (the "Custody Case"). (App. 743; 393). ***In that petition, Tatari expressly admitted that Durust has sole custody of the Child.*** (App. 744). At trial, Appellee acknowledged that he "asked for a change of custody, which means [Appellant] has custody." (App. 408). Appellee also sought various forms of interim relief, including that he be granted temporary custody of the Child while the Custody Case was pending and to enjoin the Child from traveling abroad. (App. 765, 411-12). On February 22, 2024, the Turkish Court rejected all of Appellee's requests for interim relief, including his request to prevent Appellant from traveling abroad with the Child. (App. 733, 412, 419-20).

On February 29, 2024, the Turkish Court held a hearing in a related proceeding pertaining to the parties and the Child, during which the Turkish Court concluded that, ***in the Divorce Decree, "it was decided to grant the custody of [the***

***Child] to his mother.***" (App. 725, 489).

On June 28, 2024, upon his finding out that Appellant would be taking the Child to the United States, Appellee e-mailed Appellant threatening that he would submit a special application to the U.S. Consulate and Government because of his concern that the child "***may have been abducted***" by Appellant. (App. 798 (emphasis added).) At trial, Appellee admitted that, at that time, he "had concern that [Appellant] was going to *kidnap* the child." (App. 430 (emphasis added)). He was therefore worried Appellant would relocate to the United States with the Child.

Less than two weeks later, on July 10, 2024, Appellee made an application to the Turkish Court, asserting that Appellant was "practically abducting the joint child abroad" and expressed a concern that the Child would be "taken away from him" and become "completely estranged from his father." (App. 737). The application also states that Appellee heard that Appellant "plans to take the joint child abroad (United States of America)." (*Id.*). Appellee's July 2024 application sought "[t]o prevent the joint child from going abroad without [Appellee's] and the Court's knowledge . . . since there is an ongoing case and [Appellee] does not currently give consent." (App. 738).

On July 12, 2024, the Turkish Court issued its decision on Appellee's July application (the "July Order"). (App. 720-21). In the July Order, the Turkish Court noted that Appellee's biggest concern was that Appellant would "abduct the joint

child abroad without waiting for the case result" and that "the joint child would be away from his father." (App. 720). ***Nevertheless, the Turkish Court "decided to reject the request" because "the mother has custody" and "the party with custody rights may use her rights arising from custody, and moreover, she has the initiative to go abroad."*** (*Id*.). Therefore, the Turkish Court, in denying Appellee's request, clearly ruled that Appellant has sole custody of the Child, which allowed her to move abroad with the Child. (App. 493).

### D. <u>Appellant's Move to New York and Subsequent Turkish Litigation</u>

Appellant moved to the United States with the Child in August 2024. Following the move, Appellant filed a petition in the Turkish Court to modify Appellee's visiting days with the Child. (App. 868-69). As Appellee's expert acknowledged, under Turkish law, this is the appropriate step to be taken by a parent that has sole custody after relocating with a child. (App. 225).

Following Appellant and the Child's move to the United States, Appellee made several applications to the Turkish Court to expedite the Custody Case and to have custody changed on an interim basis because Appellant "abduct[ed]" the Child to the United States. (App. 414, 41, 790-91, 795). In his application, dated October 17, 2024, Appellee also noted that he brought this Hague Convention action and claimed the Child was traumatized by being separated from his father. (App. 790). Nowhere in his emergency application to the Turkish Court did he claim that he has

joint custody (or any custodial rights over the Child) that were violated by Appellant's relocation with the Child, as he has claimed in this litigation. (App. 790-91, 795; *see also* 485-86).

Despite Appellee's assertion that the Child was abducted to the United States by Appellant, on November 4, 2024, the Turkish Court denied Appellee's request to expedite the Custody Case and did not grant his request to change custody of the Child to him on an interim basis. (App. 803, 416, 436, 492).

The Custody Case is still pending in Turkey. Importantly, Appellee never asked that the Turkish Court direct Appellant to return the Child to Turkey and the Turkish Court never ordered Appellant to do so.

E. **This Hague Convention Action and the District Court's Order**

On October 1, 2024, Appellee filed his Petition seeking the return of the Child to Turkey. (App. 11). The District Court held an expedited trial on December 11 and 12, 2024. (App. 8). The District Court granted Appellee's Petition in its January 29, 2025 Order and February 3, 2025 Judgment and ordered that the Child be returned to Turkey. (SPA 37, 38). In the Order, the District Court held that the Appellee had a custodial right, specifically a *ne exeat* right, under Turkish law, which was infringed when the Appellant brought the child to the United States without Appellee's consent. (App. 37).

Following the Court's issuance of the Judgment, Appellant immediately moved for a stay of the District Court's Order and Judgment pending appeal. (App. 9). On February 7, 2025, the District Court denied Appellant's motion but granted an administrative stay of the child's return date so that Appellant could seek emergency relief from this Court. (App. 10). On February 12, 2025, Appellant sought an emergency stay in this Court and on February 18, 2025, this Court granted a temporary stay.

## **SUMMARY OF ARGUMENT**

I.      The District Court erred in disregarding the prior orders of the Turkish Court. In the Turkish Court's July Order, the Court rejected Appellee's request to stop Appellant from relocating with the Child on the basis that Appellant had sole custody of the Child. (App. 720). The District Court inexplicably concluded that the July Order was not relevant, claiming it was not based on a request by Appellee to stop Appellant from moving abroad with the Child, but merely prevented her from "traveling" with the Child. (SPA 31-32). This finding is demonstrably in conflict with the evidence in the record, including Appellee's application to the Turkish Court, which expresses his concern that Appellant would "*abduct*" the Child and Appellee's own expert's testimony that the concern expressed to the Court was about *relocation*, not travel. (App. 737, 239-40, 287). The July Order is dispositive as it reflects the Turkish Court's finding as to Appellant's sole custody status and ability

- 13 -

to relocate abroad just weeks before Appellant's move to America. This ruling, as well as the Turkish Court's other rulings upholding Appellant's sole custodial rights, are expressly contrary to the District Court's Order that Appellee violated Appellant's custodial rights, warranting reversal of the Order.

II.     The District Court erred in finding that the Divorce Decree gives Appellee custodial rights when it clearly provides Appellant with sole custody of the Child. (App. 583). In addition, Appellee acknowledged, as recorded in the Divorce Decree that Appellant has sole custody and thus the sole right to make decisions for the Child, including the right to relocate abroad. (App. 584). Appellee further acknowledged, as memorialized in the Divorce Decree, that his sole remedy if Appellant moved abroad with the Child without his consent was to seek a change of custody. (*Id*.) These acknowledgments (regardless of whether they have any binding effect) are fully consistent with the terms of the Divorce Decree and the Turkish Court's interpretation of the Divorce Decree in its July Order. The District Court's Order is in direct conflict with the language of the Turkish Court's order in the Divorce Decree and Appellee's admission that Appellant has the right to move abroad with the Child.

III.    The District Court made findings about Turkish law that were in direct contravention of the Turkish Civil Code, the terms of the Divorce Decree, and what all the Turkish legal experts testified to at trial. All of the Turkish legal experts at

trial testified that there were only two types of custodial rights in Turkey. The primary right is sole custody. The experts agreed that sole custody rights in Turkey unequivocally allow a parent to relocate with their child without the other parent's consent. While the legal experts acknowledged that Turkey also permits parties to agree on joint custody, this is a limited doctrine requiring express use of the term "joint custody"—a condition that is not met here in the parties' Divorce Decree. Because the Divorce Decree does not provide for joint custody, instead expressly awarding sole custody to Appellant, Appellant can relocate abroad with the Child under Turkish law. The Divorce Decree and Turkish law are both clear that Appellee's remedy if he does not agree with Appellant's decision-making is to seek a change of custody—a right Appellee exercised in the Turkish Courts. Appellee did not file an application in the Turkish Court to find that Appellant violated the Divorce Decree by relocating abroad with the Child or to direct Appellant to return with the Child to Turkey. Instead, Appellee sought relief in a United States Court because he knew he could not obtain this relief in Turkey, as the Divorce Decree did not provide him with the right to veto Appellant's move to the United States with the Child. However, the District Court improperly concluded that the provisions in the Divorce Protocol created a third type of custodial rights in Turkey: *ne exeat* custodial rights, even though it was uncontested at trial that Turkish Law does not recognize *ne exeat* rights. Thus, the District Court's Order was clear error.

- 15 -

IV.     At a minimum, the District Court should have sent the question of whether Appellee has custodial rights to the Turkish Court—where there are currently custody proceedings pending—pursuant to Article 15 of the Hague Convention.   The District Court's conclusion that Appellee's expert credibly testified the Turkish Courts do not accept Article 15 requests, (SPA 37), is belied by Turkey's country profile on the Hague Conference on Private International Law website, which expressly indicates that Turkey accepts Article 15 requests.

## STANDARD OF REVIEW

"In cases arising under the Convention and ICARA, [this Court] review[s] a District Court's factual determinations for clear error. Interpretation of the Convention, however, is an issue of law, which [this Court] review[s] *de novo.*" *Lozano v. Alvarez*, 697 F.3d 41, 49-50 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) (citations omitted).  This Court also reviews *de novo* "the District Court's *application* of the Convention to the facts it has found." *Id.* (citations and quotation marks omitted).   Additionally, the District Court's interpretation of foreign law must be reviewed *de novo. See Pignoloni v. Gallagher*, 555 F. App'x 112, 114 (2d Cir. 2014) (Summary Order).

## ARGUMENT

## I.     HAGUE CONVENTION LEGAL STANDARD

For Appellee to prevail on his claim for wrongful removal under the Hague Convention, Appellee must prove that: (a) the Child was habitually resident in

- 16 -

Turkey at the time of the removal; (b) the removal was in breach of Appellee's custody rights under Turkish law; and (c) Appellee was exercising those rights at the time of removal. *See Takeshi Ogawa v. Kyong Kang*, 946 F.3d 1176, 1178-79 (10th Cir. 2020). Appellee must prove each of these elements by a preponderance of the evidence. *See Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005); 22 U.S.C.A. § 9003(e)(1).

The purpose of the Convention is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Conv. Art. 1. "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken." *Ozaltin v. Ozaltin*, 708 F.3d 355, 359 (2d Cir. 2013).

Article 5 of the Convention defines "rights of custody" as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Hague Conv. Art. 5. Courts consult the law of the Child's habitual residence to determine whether the right at issue is a right of custody. *Abbott v. Abbott*, 560 U.S. 1, 10 (2010).

The Convention was intended "to lend priority to the custody determination hailing from the child's state of habitual residence." *Ohlander v. Larson*, 114 F.3d

1531, 1541 (10th Cir. 1997). The District Court's Order violates the clear intent of the Hague Convention because in it, the District Court (a *United States* court) ruled on *Turkish* custody issues in a manner directly contrary to a prior ruling of the Turkish Court. Specifically, the District Court ruled that Appellee has custodial rights over the Child when the Turkish Court repeatedly ruled that Appellant has sole custody of the Child and specifically held that Appellant's sole custody rights allow her to relocate with the Child.

Contrary to the District Court's Order, at trial, Appellee failed to meet his burden of proving that Appellant's relocation to the United States with the Child was a violation of his custodial rights. In fact, the evidence at trial conclusively showed that, at the time that Appellant moved with the Child to the United States, Appellee was not vested with any custodial rights under the laws of Turkey. There was therefore no breach of his custodial rights. Because Appellee failed to prove the second element of his claim under the Hague Convention, this Court must reverse the Order. In the alternative, Appellant asks this Court to remand to the District Court and direct the District Court to require Appellee to certify the relevant questions of law to Turkey pursuant Article 15 of the Hague Convention.

## II. THE DISTRICT COURT ERRED BY OVERRULING PRIOR TURKISH COURT ORDERS DECIDING THAT APPELLEE DID NOT HAVE ANY CUSTODIAL RIGHTS UNDER TURKISH LAW

The District Court erred by essentially reversing multiple decisions by the Turkish Court which consistently found that Appellant had sole custodial rights of

- 18 -

the Child and rejected all attempts by Appellee to restrict those rights. The Turkish Court has not only repeatedly held that Appellant has sole custody of the Child, but also expressly decided the question at issue in this litigation—whether Appellant has the right to relocate with the Child abroad—and concluded that Appellant has the right to go abroad with the Child without Appellee's consent. (App. 720).

Pursuant to Article 3 of the Hague Convention, custody rights are determined "under the law of the State in which the child was habitually resident immediately before the removal." Hague Conv. Art. 3. The District Court recognized in the Order that Appellee's custodial rights are "defined by Turkish law." (SPA 26). Yet, inexplicably, the District Court Order disregarded the prior decisions of the Turkish Court even though they are the definitive authority on Turkish law and are conclusive on the issue of Appellee's lack of custodial rights. The Order therefore violates the purpose of the Hague Convention—that the "rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Chafin v. Chafin,* 568 U.S. 165, 168 (2013).

### A. The District Court Improperly Discounted the Turkish Court's Repeated Rejections of Appellee's Requests to Prevent Appellant from Relocating with the Child, Not Merely Traveling

On three occasions before the trial in this matter, the Court in Turkey ruled that Appellee does not have any custodial rights over the Child.

- 19 -

**1. Appellee First Sought Custodial Rights from the Turkish Court in January 2024 and the Turkish Court Rejected that Request**

In January 2024, in his Custody Case, Appellee first moved in the Turkish Court for a change of custody. In his application, Appellee admitted that Appellant had been given sole custody over the Child stating: "It was agreed that the custody of [the Child] would remain with the mother," meaning Appellant, and requesting that "[Appellant's] right of custody over [the Child] be removed and the custody of the joint child be granted to the client father," meaning Appellee. (App. 744).

At trial, Appellee testified that he "admit[ted] in [his] petition to the Turkish court that Ms. Durust has sole custody of the child" and that he had left sole custody to Ms. Durust." (App. 408). In addition, Appellee's own experts explained at trial that a change of custody proceeding, like the Custody Case filed by Appellee, is the only process by which a parent *without* custodial rights can challenge the decision making of the custodial parent, including their sole right to relocate abroad. (App. 285, 231, 619-20). Thus, the mere fact that Appellee brought a change of custody proceeding is a definitive acknowledgement of his lack of custodial rights.

Appellee also repeatedly sought temporary custody of the Child while the Custody Case proceeded through litigation, which the Court denied, leaving sole custody of the Child with Appellant. (App. 765; 733).

In addition, prior to his unsuccessful effort to block the Appellant from relocating with the Child in July 2024, Appellee also sought to restrict Appellant's ability to travel with the Child, a direct challenge to her absolute rights as the sole custodian under Turkish law. (App. 765). The Turkish Court rejected Appellee's effort to curtail Appellant's custodial rights, further confirming that Appellant's custodial rights cannot be limited by Appellee absent a change of custody. (App. 733).

### 2. Appellee Next Sought to Restrict Appellant's Right to Relocate with the Child Abroad in July 2024 and the Turkish Court Rejected That Request

In the July Order, the Turkish Court expressly made two rulings that should have resulted in the District Court's denial of Appellee's application. First, the Turkish Court recognized that, under the parties' Divorce Decree, Appellant had custody of the child. Under Turkish law, as agreed to by all the experts, this meant the Appellee had the right to relocate without the Appellant's consent. The Court then specifically denied Appellee's request to stop Appellant from relocating with the child because *"since the parties were divorced, the mother has custody,"* and *"the party with custody rights may use her rights arising from custody, and moreover, she has the initiative to go abroad."* (App. 720).

Despite these clear rulings by the Turkish Court, the District Court concluded that the July Order was not relevant, claiming it was only "a denial of

[Appellee's] request for extraordinary measures to prevent Appellant from traveling," rather than a decision on Appellant's right to relocate abroad with the Child. (SPA 32). This finding is demonstrably in conflict with the evidence in the record and is clear error.

In the Order, the District Court relied on Appellant's testimony "that she had not decided as of August 20, much less July 10, whether she and [the Child] would move to America or just visit there" in concluding the July Order did not pertain to relocation. (App. 32). But whether Appellant decided to relocate at that time is irrelevant. What is relevant is that Appellee expressly raised concerns in his July 2024 petition and the parties' correspondence leading up to its filing that Appellant was going to relocate with the Child—not merely that Appellant would engage in short term travel with the Child.

Indeed, it is evident that Appellee's July 2024 petition was based entirely on his fear that Appellant was going to *relocate* with the Child to New York, not merely *travel* with him to New York. In June 2024, just days before he filed his application to the Turkish Court, Appellee emailed Appellant, that he "*suspect[s] that [the Child] may have been abducted*." (App. 798 (emphasis added); 429-30). At trial, Appellee admitted that he "had concern that Ms. Durust was going to *kidnap* the child" and that he "filed a petition because [he] had concern that [Appellant] was going to *move the child abroad*." (App. 432 (emphasis added)).

- 22 -

Indeed, in his July 2024 petition, Appellee told the Turkish Court, "[Appellant] is practically *abducting [the Child] abroad*" and that the Child would be "taken away from him" and become "completely estranged from his father." (App. 737 (emphasis added)).

Appellee's own expert testified that, while "travel" and "relocating" are distinct requests, concerns about "abduction" are equivalent to "relocation." (App. 287-88). This means that, according to Appellee's own experts, any request by Appellee to prevent Appellant from "abducting" the Child was equivalent to a request to prevent her from "relocating" abroad with the Child.

On July 12, 2024, the Turkish Court denied Appellee's petition to prevent Appellant from moving to the United States. (App. 720). The Court "reject[ed] the request" because "since the parties were divorced, *the mother has custody*" and "the party with custody rights *may use her rights arising from custody*" which included "*the initiative to go abroad*." (*Id.* (emphasis added). At trial, Appellee admitted that, in entering the July Order, "the Turkish court recogniz[ed] that [Appellant] has custody and not [Appellee]." (App. 434-35). In reaching its conclusion, the Court acknowledged that Appellant did not have Appellee's "consent" to relocate with the Child to New York. (App. 720). The Court further noted that Appellee was concerned that Appellant was going "abduct" the Child. (*Id.*). Appellee's Turkish legal expert, Mert Yalcin, confirmed that Appellee

- 23 -

petitioned the Turkish Court "because of this fear for relocation, to not allow [Appellant] to travel abroad," and the Turkish Court rejected Appellee's request, "not[ing] that the mother has custody." (App. 287-88).

Thus, the District Court's conclusion that the July Order only pertains to a limitation on temporary travel, not relocation, is in direct conflict with the July Order itself, as well as Appellee's own Turkish legal expert's explanation of the July Order. Moreover, the District Court's finding that the July Order only related to Appellant's right to travel is also inconsistent with the fact that the Turkish Court had already denied Appellee's request to prevent Appellant from traveling with the Child seven months prior. (App. 733).

The District Court misses the significance of the July Order. The Turkish Court's reasoning in the July Order—that Appellant has sole custody—is determinative here because a party with sole custody in Turkey has the absolute right to relocate with their child. The July Order was issued just weeks before Appellant's move to the United States and is therefore controlling. *See White v. White*, 718 F.3d 300, 308 (4th Cir. 2013) (order "in effect at the time of the child's removal, therefore controls this case").

The District Court attempts to circumvent the dispositive effect of the July Order, claiming it was not a "clear order permitting [Appellant] to move abroad without Appellee's consent" because "Turkish courts require changes in custody

rights to be clear and explicit." (SPA 32). The District Court relied on *Ozaltin v. Ozaltin*, 708 F.3d 355 (2d Cir. 2013) in reaching this conclusion. However, in *Ozaltin*, this Court noted that the respondent "has not presented any Turkish orders (issued prior to her removal of the children in 2011) that explicitly granted her sole custody of the children or otherwise redefined the parties' respective rights such that she could remove the children to the United States without breaching the Father's rights of custody." *Ozaltin*, 708 F.3d at 370. Yet here, the July Order is exactly what was missing in *Ozaltin*—an order expressly stating that Appellant had sole custody, which meant she had the ability to move abroad with the Child.

Notably, the District Court's assertion that the July Order needed to be "clear and explicit" to effectuate a "change in custody rights" is also misguided. There was no *change* needed for Appellant to have the ability to move abroad with the Child because she *already* had sole custody of the Child. (App. 584). All the July Order did was reconfirm what was already clear from the Divorce Decree itself—Appellant has sole custody and her sole custodial rights under Turkish law mean that she is not restricted from relocating abroad with the Child. The District Court's Order in essence modified the plain terms of the Divorce Decree by concluding Appellee had custodial rights he clearly does not have.

### 3. The November 2024 Order Reaffirmed the Turkish Court's Opinion that Appellant Has Sole Custody and Can Relocate Without Appellee's Approval

On October 17, 2024—two weeks after Appellee filed the complaint initiating this case—Appellee filed another motion in the Turkish Court asking the Turkish Court to "speed up" resolution of Appellee's change-of-custody petition and award him immediately temporary custody of the Child. (App. 443, 790-91). In that motion, not only did Appellee make the Turkish Court fully aware of what had transpired with respect to Appellant relocating to the United States with the Child, but he used this fact as the basis for his emergency requests. Specifically, Appellee wrote, "[T]he defendant [Appellant] must have understood that the custody rights would be taken from her, and she abducted[2] the child in common [], without the knowledge of [Appellee], to the United States of America." (App. 790). Appellee further told the Turkish Court that he had initiated this case in the United States. (App. 790).

Despite Appellee's claim that he was entitled to relief because Appellant improperly abducted the Child, the Turkish Court rejected Appellee's renewed request for temporary change of custody and denied his request to expedite the

---

[2] Notably, Appellee used the word "abducted" in his November 2024 application, made after Appellant's relocation. This is the same word Appellee used in his July 2024 petition, further illustrating that what the Turkish Family Court ruled on in July 2024 was Appellee's effort to prevent Appellant from relocating abroad with the Child. This is directly contrary to the District Court's erroneous finding.

hearing on the petition. (App. 803). At no time did the Turkish Court admonish Appellant for moving to the United States with the Child, order her to return to Turkey with the Child, or state that Appellee had custodial rights that were violated. Thus, every attempt Appellee made to gain even temporary custodial rights was flatly rejected by the Turkish Court.

**B.** **The District Court Order Improperly Overruled Dispositive Decisions of the Turkish Court In Violation of the Central Tenants of the Hague Convention**

The July Order is dispositive as it reflects the Turkish Court's finding as to Appellant's sole custody status and ability to relocate abroad just weeks before Appellant's move to America. This ruling, as well as the Turkish Court's other rulings upholding Appellant's sole custodial rights, are expressly contrary to the District Court's Order that Appellant violated Appellee's custodial rights.

The District Court asserted that it did "not need to defer to [the July] opinion of the Turkish court because it was not an application of the Hague Convention, or even an adjudication of an attempt to relocate abroad, and thus it arose under different facts triggering different considerations." (SPA 32 n.10). But this conclusion is directly contradicted by Appellee's clearly expressed concerns that Appellant would abduct the Child abroad and the July Order's rejection of Appellee's attempt to limit Appellant's ability to go abroad with the Child, despite Appellee's explicitly raised concerns about abduction.

In addition, the District Court is actually required to "defer" to Turkey's determination of Appellee's custodial rights, because Article 3 of the Hague Convention requires this Court to rely on "the law of the State in which the child was habitually resident" in determining whether there is a breach of rights of custody under the Hague Convention. Hague Convention Art. 3.

Indeed, the Hague Convention was specifically intended to ensure that the country of the Child's habitual residence is the country that decides custodial rights. As the Supreme Court made clear in *Abbott v. Abbott*, "[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." 560 U.S. at 20; *see also Souratgar v. Lee*, 720 F.3d 96, 106 (2d Cir. 2013) ("The Convention defers the determination of custody to courts in the country where the child habitually resides."). All Appellant is seeking is that United States Courts respect the "decisions regarding custody rights" already made by the Turkish Court. *Abbott*, 560 U.S. at 20.

The Tenth Circuit's decision in *Shealy v. Shealy*, 295 F.3d 1117, 1124 (10th Cir. 2002) is instructive. In *Shealy*, there was an interim German Family Court order that permitted the respondent to remove the child from Germany without the petitioner's permission should it become necessary for military reasons. There was then a military order issued, which created a necessity for respondent to leave

Germany with the child. In a subsequent order, the German court, interpreting the law of Germany, concluded that the respondent's removal of the child was not wrongful because of the military order.

The Tenth Circuit held that the District Court properly deferred to the German Court order and "decline[d] to second guess the German Court." In addition, the Tenth Circuit relied on the interim German Family Court order to conclude that the petitioner had no *ne exeat* right under these circumstances because respondent was permitted to leave Germany where there was a military necessity. Although the petitioner in *Shealy* claimed the "interim" nature of the German Family Court Order should not be controlling as to his custodial rights, the Tenth Circuit determined that "the interim decision of the German court is dispositive" because it "delineated the status quo in the period between the instigation of the action and a final determination by the court." Thus, there was no wrongful removal because the interim order in place at the time of the removal permitted the petitioner to leave Germany with the Child, as did the July Order here.

The District Court's decision to ignore and overrule determinations of Turkish law made by a Turkish Court exhibits a fundamental misunderstanding of the Hague Convention. Tt also incentivizes "precisely the sort of international forum shopping the Convention seeks to prevent." *Barzilay v. Barzilay*, 600 F.3d

- 29 -

912, 922 (8th Cir. 2010); *Ozaltin*, 708 F.3d at 376-77 (admonishing the petitioner for his inappropriate "forum-shopping efforts" which "run contrary to the purpose of the Hague convention."). *See also Souratgar*, 720 F.3d at 102 (noting the Hague Convention's purpose is to "deter parents from crossing international boundaries in search of a more sympathetic court.") (citations omitted).[3]

This Court should uphold the principles of the Hague Convention and reverse the District Court's Order on the basis that Appellee's claim is foreclosed by the multiple Turkish Court opinions declaring that Appellant has sole custody of the Child and denying any and all previous attempts by Appellee to limit Appellant's custodial rights.

---

[3] Additionally, the district court's order violates the principles of comity. *See Diorinou v. Mezitis*, 237 F.3d 133, 142 (2d Cir. 2001) ("American courts will normally accord considerable deference to foreign adjudications as a matter of comity."); *Miller v. Miller*, 240 F.3d 392, 401 (4th Cir. 2001) (deferring to the Ontario Court of Appeal order of custody because "the Convention was meant, in part, to lend priority to the custody determination hailing from the child's state of habitual residence") (citation omitted). "[C]omity is at the heart of the [Hague] Convention," *Trott v. Trott*, No. 20-CV-1392 (AMD) (CLP), 2020 WL 4926336, at *5 (E.D.N.Y. Aug. 21, 2020) (citations omitted). Courts have applied the doctrine of comity in the context of the Hague Convention, deferring to the foreign courts where the questions at issue in the domestic Hague Convention proceeding have been or will be determined in the foreign proceeding. *See, e.g., Diorinou*, 237 F.3d at 145; *Trott*, 2020 WL 4926336, at *7; *Ohlander*, 114 F.3d at 1538–39. The same logic should apply here to the Turkish Court's prior rulings because the Turkish Court, applying its own law, is in a better position to make a determination as to whether Appellee has custodial rights over the Child.

## III. THE DISTRICT COURT ERRED IN FINDING THAT THE DIVORCE DECREE GAVE APPELLEE CUSTODIAL RIGHTS

The District Court erred in holding that Appellee has custodial rights pursuant to the terms of the Divorce Decree.

By its plain terms, the Divorce Decree unequivocally gives sole custody of the Child to Appellant. The District Court even acknowledges that Paragraph 2 of the decision of the Turkish Divorce Court "gives custody of [the Child] to Appellant" and notes that the Turkish Judge explained her findings of the appropriateness of a divorce and that 'the custody of the joint child is awarded to the mother pursuant to Article 182 of the' TCC." (SPA 21).

The Divorce Decree could not be more clear that the Turkish Court ordered that Appellee has sole custody of the Child. Indeed, the Turkish Court concluded that, in the Divorce Decree, "it was decided to grant the custody of the [Child] to his mother." (App. 725). Appellee's own expert, Professor Burak Huysal, also acknowledged that the language in the Divorce Decree—that "the mother shall be appointed as the custodian of the child"—provides for sole custody. (App. 229). Furthermore, Dr. Inal similarly concluded that this language in the Divorce Decree grants sole custody to Appellant. (App. 457). Thus, there can be no dispute that, based on the plain language of the Divorce Decree, Appellant was awarded sole custody of the Child.

Moreover, Appellee *admitted* that he does not have custodial rights *in the Divorce Decree itself.* As the District Court noted in the Order, Appellee acknowledged, as reflected in the Divorce Decree, that "in matters such as making important decisions regarding the child's health and the relocation of their residence abroad, [Appellee could] legally make decisions alone under the scope of custody" and that he "reserve[d] the right to file a lawsuit regarding the change of custody" if [Appellee] "[did] not obtain [his] opinion and approval [in making those decisions] as agreed in the protocol." (SPA 21).

In addition, the District Court found that, "[a]lthough [Appellee] testified he did not recall making the statement that is recorded in the Decree, there is no reason to doubt that [Appellee] said what was recorded in the Decree." (SPA 21 n.3). Thus, the District Court acknowledged that Appellee admitted the exact position of Appellant in this proceeding: that Appellant has sole custody and thus the sole right to make decisions for the child, including the right to relocate abroad, and the only way for Appellee to object to Appellant's decisions is for him to obtain a change of custody from the courts.[4] The latter admission by Appellee is significant because all of the experts on Turkish law recognized that the sole remedy for a parent *without*

---

[4] The district court did not "credit [Appellant's] assertions that the 'Judge made [Appellee] acknowledge Appellant's ability to relocate" (SPA 31). However, there is no other reasonable explanation for why Appellee would voluntarily state, on the record at the Divorce hearing, that Appellant's sole custody rights meant she could relocate abroad with the Child.

- 32 -

custodial rights in Turkey to challenge a decision about a child is to file for a change of custody. (App. 285, 466, 619-20). Appellee exercised this right by filing a change of custody proceeding in January 2024. (App. 743).

The District Court disregarded Appellee's acknowledgment on the basis that "it is clear that the divorce judge was not bound by the parties' statements and the Divorce Decree as written is the governing order." (SPA 30). But whether the acknowledgment by Appellee is legally binding is irrelevant. The fact that the divorce judge required Appellee to make this acknowledgment on the record conclusively illustrates the validity of Appellant's position that the Divorce Decree provides her with sole custody and the sole right to relocate abroad with the Child without his consent.

It was improper for the District Court to disregard Appellee's admissions and essentially modify the plain language of the Divorce Decree by finding Appellee has custodial rights when Appellant has sole custody. This Court should adopt the interpretation of the Divorce Decree that Appellee himself acknowledged during the divorce proceeding—that Appellant has sole custody and the right to relocate with the Child—an interpretation that is also fully consistent with the Turkish Court's prior orders.

**IV. THE DISTRICT COURT ERRED IN FINDING THAT THE DIVORCE PROTOCOL PROVIDES APPELLEE WITH CUSTODIAL RIGHTS**

**A. The Divorce Protocol Does Not Confer Custodial Rights on Appellee Because it is Not a Court Order**

The District Court improperly concluded that Appellee has custodial rights based on the Divorce Protocol. (SPA 32). However, the Divorce Protocol is distinct from the Divorce Decree—which is the Turkish Divorce Court's order providing Appellant with sole custody of the Child. The Divorce Protocol is the agreement the parties made and presented to the Turkish Court at the time of their divorce hearing. (App. 218, 366, 512). The Divorce Protocol is not an enforceable Court order that can confer a custodial or *ne exeat* right.[5] As explained by Dr. Inal, the Divorce Protocol constitutes a promise between the parties, which is not the order of the Court and is therefore not binding upon the parties. (App. 463). Similarly, Ali Ugur, a Turkish family lawyer, testified that the Divorce Protocol does not, in any way, change Appellant's sole custody rights. (App. 494).

In concluding that the Divorce Protocol was an enforceable part of the Turkish Court's order, the District Court relied on the language in Section 4.2 of Petitioner's Exhibit 29, which stated that the provisions of the protocol "shall be approved in

---

[5] The dispute over the correct translation of Section 3.7 in the Divorce Decree—whether it requires Appellant to "seek the opinion" or "seek the approval" of Appellee to relocate abroad with the Child—is therefore entirely irrelevant.

- 34 -

accordance with Article 184/5 of the Turkish Civil Code and considered part of the decision." (SPA 23). This was erroneous for several reasons.[6]

First, Appellee submitted two other translations of the Divorce Protocol, none of which provided that the Divorce Protocol was "considered part of the decision." (App. 587, 854-55).

Furthermore, that language in Petitioner's Exhibit 29 was never affirmed to be accurate by any witness at trial or by any expert in an opinion submitted in this case. In fact, Appellee's translation expert was specifically instructed not to review or opine on any portion of the Divorce Protocol outside of Section 3.7 and 3.8, which was highly suspect. (App. 355-60)

This is especially true since Petitioner's Exhibit 22, the original translation that was obtained by Appellant in 2023, before Appellee ever filed the change-of-custody case in Turkey or hired experts for the Hague trial (App. 517, 519), states that the Divorce Protocol was simply *annexed* to the order, (App. 587).

The District Court attempts to circumvent this issue by relying on the language in Section 4.2 stating the Court "approved" the Divorce Protocol. (SPA 23). The District Court cites to Turkish Civil Code Art. 184/5, which states that "Agreements

---

[6] Appellee did not lay a proper foundation for the accuracy of the translations in Petitioner's Exhibits 28 and 29. *See De Vasconcelos v. De Paula Batista*, No. 4:10-CV-00628, 2011 WL 806096, at *2 n.1 (E.D. Tex. Mar. 1, 2011) (While authentication requirements are relaxed in Hague Convention cases, "it does not absolve [Appellee] from providing the Court with accurate English translations.").

as to accessory consequences of divorce . . . shall only be valid if they are approved by the judge." However, that provision does not support the District Court's conclusion that the Divorce Protocol "is enforceable in some manner" (SPA 29) because does not state that a "valid" agreement has the force of a Court order. No Turkish legal expert at trial testified that Turkish Civil Code Art. 184/5 transforms an agreement between parties into an enforceable court order that creates custodial rights.[7]

The fact is that the any real disagreement on whether the Divorce Protocol was somehow binding and enforceable and provided custodial rights to Appellee was definitively resolved by the subsequent decisions of the Turkish Courts and admissions by the Appellee in subsequent court filings acknowledging that Appellant was awarded sole custody by the Divorce Decree.

It is Appellee's burden to prove that, under Turkish law, he has custodial rights that were violated by Appellant moving to the United States with the Child. *White*, 718 F.3d at 305. Because the Divorce Decree clearly states that Appellant has sole custody of the Child, Appellee made admissions at the divorce hearing

---

[7] The District Court claimed that Appellant could not argue that the Divorce Protocol did not have the force and effect of a court order when she sought to enforce provisions of the Divorce Protocol herself. (SPA 29). However, Appellant's request that Appellee provide the financial support he promised in an agreement does not establish that the Divorce Protocol is an enforceable court order. A contract and an order are quite distinctive from each other.

acknowledging that Appellant had sole custody and could relocate abroad with the Child at her sole discretion, and the July Order verified Appellant's sole custodial rights and her ability to relocate abroad with the Child, the District Court's finding that the Divorce Decree somehow provided Appellee with custodial rights is clear error and an improper modification of the clear terms of the Divorce Decree, contrary to Turkish law.

### B. The District Court Improperly Created Custodial Rights that Do Not Exist Under Turkish Law

As the District Court recognized, the "substance of the potential rights of custody is determined by the law of the habitual residence, here Turkey. What rights [Appellee] has are thus defined by Turkish law." (SPA 26 (citations omitted)). Nevertheless, the District Court committed reversible error by creating a third type of custodial right that does not exist under Turkish law—a *ne exeat* right—when Turkish law only recognizes sole and, in limited circumstances and where explicitly stated, joint custody.

Every Turkish legal expert at trial agreed that almost all custodial arrangements in Turkey provide for sole custody. Dr. Inal testified that the "Turkish Civil Court recognizes only sole custody." (App. 456; 828). Appellee's expert, Mr. Yalcin, similarly testified that the Turkish Civil Code directs "sole custody regulations." (App. 264). Appellee's other Turkish law expert, Professor Huysal, stated in his report that "[i]n most cases, Turkish courts award sole custody to one

parent after divorce." (App. 676). All of the Turkish legal experts agreed that if a party has sole custody, they have the absolute right to relocate without the other parent's consent. (App. 225, 264, 286, 465-66, 619, 830-32).

The District Court Order recognizes that that "Turkish law [] does not formally recognize joint custody." (SPA 18). While the legal experts acknowledged that Turkey permits parties to agree on joint custody, Dr. Inal, and Mr. Yalcin, both confirmed that an award of joint custody is not typical under Turkish law, with Dr. Inal explaining that it is only granted in "exceptional cases" and Mr. Yalcin noting that courts in Turkey are "reluctant" to approve joint custody. (App. 457, 286, Petitioner's Exhibit 31 at B.6; *see also* App. 669 ("courts are often hesitant to grant joint custody"). Dr. Inal, Turkish family lawyer, Mr. Ugur, and Professor Huysal, all agreed that, for a divorce decree to provide for joint custody, the parties must agree to joint custody. (App. 209, 491, 459). To show an agreement to joint custody, the language in a Turkish divorce decree must be explicit and use the phrase "joint custody." (App. 491, 459-60). As Dr. Inal testified, it should be "as clear as the daylight" if a divorce decree provides for joint custody. (App. 459).

Because the only options under Turkish law are sole custody or joint custody, Appellee took the position that the Divorce Decree provided him with joint custody. However, in the Order, the District Court claims that Appellee "has not argued that

the has formal joint custody" (SPA 32). That is demonstrably false. Appellee's expert, Mr. Yalcin clearly asserted that Appellee has joint custody. (*See* App. 292 (testifying that Appellant has "joint custody with Mr. Tatari"); App. 628 ("In this case . . . the custody and responsibility of the child are shared jointly").) Similarly, Appellee's expert, Professor Huysal, testified that the parties agreed to resolve their divorce "[b]y joint custody" and in his expert report stated "[t]his case at hand is a clear example of joint custody practice," even though he acknowledged that the exact language of the Divorce Decree indicated a sole custody regime. (App. 209-10, 211, 668). Appellee's claim of joint custody is untenable in light of the fact the plain terms of the Divorce Decree give Appellant sole custodial rights, that no translation of the Divorce Decree states that the parties have "joint custody," and that Appellee admitted at trial that Appellant has sole custody. (App. 408).

As Appellee does not have joint custody under Turkish law, the District Court's conclusion that Appellee has certain custodial rights, "specifically a ne exeat right under Turkish law" (SPA 37) has no support in Turkish law. Neither of Appellee's experts testified that Appellee had a *ne exeat* right or that Turkish law allows for such a right—they both took the position that Appellee has joint custody. The District Court's Order essentially provides for a third type of custody—in between sole custody and joint custody— that simply does not exist under Turkish law.

- 39 -

In *Abbott v. Abbott*, 560 U.S. 1 (2010), the Supreme Court concluded that "a parent possessing a *ne exeat* right has a right of custody and may seek a return remedy." *Abbott*, 560 U.S. at 22. However, for a parent to have a right of custody based on the existence of a *ne exeat* right, it is necessary for that parent to have a *ne exeat* right under the laws of the country of habitual residence. In *Abbott*, the father only had a right of custody because "Chilean law conferred upon [the father] what is commonly known as a *ne exeat* right: a right to consent before [the mother] could take [the child] out of Chile." *Id.* at 6. Thus, the existence of *ne exeat* rights depends entirely on the law in the origin country, Hague Conv., Art. 3.

Appellee cannot have a *ne exeat* right here because Turkish law does not provide for such a right and neither does the Divorce Decree. *See Takeshi Ogawa*, 946 F.3d at 1181 (no *ne exeat* right where divorce agreement did not provide such authority); *Radu v. Toader*, 805 F. Supp. 2d 1, 11 (E.D.N.Y. 2011), *aff'd,* 463 F. App'x 29 (2d Cir. 2012) (petitioner has not established any *ne exeat* rights under the divorce decree); *Pfeiffer v. Bachotet*, No. 1:18-CV-03446-RWS, 2018 WL 9563334, at *3–4 (N.D. Ga. Aug. 29, 2018), *aff'd*, 913 F.3d 1018 (11th Cir. 2019) (finding that the "divorce judgment gave Respondent the exclusive right to determine whether the children would remain in Switzerland or move to the United States" and in doing so "necessarily deprived Petitioner of the right to determine

residence", so petitioner did not have a "right of custody" under the meaning of the Hague Convention").[8]

Notably, the District Court went even a step further in ignoring Turkish law by holding that, even if the Divorce Decree only grants Appellee a right to petition for a change of custody to prevent relocation, Appellee would still have a custodial right under the Hague Convention. (SPA 34). That determination—that the right to seek a change of custody is a custodial right—is unsupported by any Turkish legal expert that testified at trial and would render the inquiry into whether a parent has "custodial rights" under the Hague Convention meaningless. Almost every parent in every jurisdiction can seek to change custody even when they currently have no custodial rights if they believe the other parent is abusing, neglecting or otherwise acting in a manner contrary to the well-being of the Child. The District Court's assertion that the ability to change custody is a custodial right would render the entire Hague Convention moot since the mere possibility of future custodial rights would

---

[8] The District Court improperly distinguishes *Radu* on the basis that the divorce decree in that case did not provide a custodial right, but as detailed herein, the Divorce Protocol does not confer custodial rights upon Appellee and the Divorce Decree clearly provides Appellee with sole custody, as did the divorce decree in *Radu*. Likewise, the District Court's attempt to distinguish *Pfeiffer* fails because as in *Pfeiffer*, the Divorce Decree provides Appellant with sole custody and, like the father in *Pfeiffer*, Appellee expressly admitted in the Divorce Decree that Appellant can move abroad with the Child without his consent. (SPA 33-34)

require return in every situation.  Unsurprisingly, the District Court Order cites no legal support for this conclusion because there is none.[9]

The District Court relies on the Eleventh Circuit's decision in *Palencia v. Perez*, 921 F.3d 1333 (11th Cir. 2019) to support its conclusion that Appellee has a *ne exeat* right, but that reliance is misplaced. (SPA 34-35). In that case, the father had patria potestad rights under Guatemalan law which "endowed [him] with joint decision-making authority" and there was no ultimate grant of full custody of the child to the respondent. *Palencia*, 921 F.3d at 1341.  Here, the Turkish Civil Code does not provide Appellee with any rights because there is final grant to Appellant of sole custody under the Divorce Decree.

The District Court also cites to *Aluker v. Yan*, No. 21-1279, 2021 WL 3417968, (4th Cir. Aug. 5, 2021).  (SPA 35-36). That case supports Appellant's

---

[9] Instead, even where a petitioner under the Hague Convention subsequently acquires custodial rights, if the petitioner did not have custodial rights at the time of the alleged removal, the removal was not wrongful. *See White v. White*, 718 F.3d 300, 306 (4th Cir. 2013) (Swiss Court order transferring custody of the child to petitioner after child's removal to the United States did not alter that respondent had sole custody at the time of the removal, so there was no breach of any custodial rights); *Slight v. Noonkester*, No. CV 13-158-BLG-SPW, 2014 WL 282642, at *7 (D. Mont. Jan. 24, 2014) (removal did not breach petitioner's custody rights where none existed at time of removal, even where Dublin Court later granted petitioner guardianship over the child because "this Court must look to the custody rights existing at the time of removal"). These cases completely undermine the District Court's position that the right to seek a custody change in the future creates a "custodial right" under the Hague Convention.

position here. In that matter, there was no wrongful removal because an agreement between the parties provided the respondent with "sole legal and primary physical custody." Likewise, the Divorce Decree, as well as the Divorce Protocol, expressly provide Appellant with sole custody.[10] Appellee therefore had no custodial rights necessitating return of the Child under the Hague Convention. *See Radu*, 463 F. App'x at 31 (where divorce decree gave sole custody of child to respondent, removal of the child did not violate petitioner's rights of custody); *Takeshi Ogawa,*, 946 F.3d at 1182 (petitioner did not have rights of custody where divorce agreement granted equivalent of sole custody to the respondent); *White*, 718 F.3d at 308 (removal was not wrongful where respondent "had sole custody of her son" and "Swiss law gave her a unilateral right to remove the child while he was in her sole custody").

Lastly, the District Court's conclusion that Appellee has a *ne exeat* right—a right which is not provided for under Turkish law—runs afoul the July Order of the Turkish Court. That order expressly rejected Appellant's attempt to create a *ne exeat* right for himself by petitioning the Turkish Court to stop Appellant from going abroad with the Child. (App. 720, 738). In rejecting Appellant's application, the Turkish Court already concluded that the Divorce Decree (including the

---

[10] The District Court's claim that Section 3.7 is a binding legal agreement, as the legal agreement was in *Aluker* under Virginia law, is based on a faulty premise that a Turkish Court's approval of an agreement transforms that agreement into an enforceable court order, when there is no legal support for that position. (SPA 35-36).

Divorce Protocol) does not provide Appellee with any right to prevent Appellant from relocating abroad with the Child. (App. 720).

Therefore, the District Court's interpretation that the Divorce Protocol provides Appellee with custodial rights when the Turkish Family Court has already found that Appellant had the absolute right to relocate abroad with the Child is grounds for reversal. *See also Livingstone v. Livingstone*, No. 22-1308, 2023 WL 8524922, at *4–5 (10th Cir. Dec. 8, 2023) (father did not carry his burden to show he possessed custody rights where a valid court order in Australia restricted the father's custodial rights); *Pereira v. Gunter*, No. 2:23-CV-5-ECM-JTA, 2024 WL 733896, at *27 (M.D. Ala. Feb. 22, 2024), *report and recommendation adopted*, No. 2:23-CV-5-ECM, 2024 WL 1095739 (M.D. Ala. Mar. 13, 2024), *appeal dismissed,* No. 24-11162-Q, 2024 WL 4541529 (11th Cir. July 12, 2024) (finding a wrongful removal would "contradict Brazil's own State Supreme Court" where court rejected petitioner's "request to maintain the restriction of the children's exit from Brazil" and "*twice* entered opinions finding that [respondent's] departure with the children in January 2022 did not violate Brazilian law or [petitioner's] custody rights").

## V. THE DISTRICT COURT ERRED IN DECLINING TO APPLY ARTICLE 15 OF THE HAGUE CONVENTION

In the event this Court does not see fit to reverse the District Court Order, it should direct the District Court to require Appellee to request a ruling from the Turkish Court's regarding Appellee's custodial rights pursuant to Article 15 of the Hague Convention. Article 15 permits courts to require that the petitioner ask the country of habitual residence for "a decision or other determination that the removal or retention was wrongful within the meaning of Article 3." Hague Conv., Art. 15.

The District Court declined to request that Appellee apply to the Turkish authorities for a determination of his custody rights pursuant to Article 15, claiming that Appellee's expert, Yalcin "credibly testified that Turkish courts do not accept Article 15 requests and he had not seen one in Turkey in his years of practice." (SPA 37 n. 11). The District Court's conclusion is undermined by Turkey's country profile on the Hague Conference on Private International Law (the "HCCH") website, which makes clear that Turkey indeed honors and responds to Article 15 requests.[11] Specifically, Section 10.2(a) of the country profile asks, "In your State is it possible for a decision or other determination to be made, in accordance with Article 15 of the Convention, that the removal or retention of a child was wrongful

---

[11] *See* Hague Conf. on Private Int'l Law, 1980 CHILD ABDUCTION CONVENTION – COUNTRY PROFILE: TURKIYE (2023), available at https://assets.hcch.net/docs/62ed5651-19cc-4d7d-82d4-587832a51873.pdf.

within the meaning of Article 3?" Turkey answered "Yes." Turkey further expressly stated on its Country Profile form that "[t]he courts" are the "authorities in [Turkey that] can issue Article 15 decisions / determinations," § 10.2(b), and that "[t]he applicant in the return proceedings" is the person who can apply for a determination under Article 15, § 10.2(c). In other words, Turkey abides by and responds to Article 15 requests.

In addition, as demonstrated by this Court's decision in *Ozaltin*, the Turkish Ministry has previously provided opinions on a party's custodial rights in Turkey for use in a Hague Convention proceeding, consistent with Article 15 (and Turkey's country profile). In that case, the Ministry, "which is Turkey's designated Central Authority for purposes of the Hague Convention" submitted a letter to the U.S. Department of State explaining that, under Turkish law, parents have joint custodial rights while a divorce case is pending in Turkey. *Ozaltin*, 708 F.3d at 364, 369. This Court relied on the Ministry's letter in concluding that the removal was wrongful based on Turkish law.

In light of the Turkey Country profile and this Turkish Ministry's provision of a letter in *Ozaltin*, Yalcin's assertion that Turkey does not accept Article 15 requests was, at best, not credible and, at worst, purposefully misleading. Moreover, the District Court's concern that invoking Article 15 would not be expedient is contradicted by the fact that there are current proceedings in Turkey during which

the parties can request a ruling from the Turkish Court on the very issue central to this case. (SPA 37 n.11). Making a request of the Turkish Court pursuant to Article 15 would be the most assured mechanism to resolve this case if this Court has any doubt about where Turkish law stands on the issue of Appellee's custodial rights, despite the multiple rulings illustrating that he has none.

## **CONCLUSION**

The District Court's Order and Judgment should be reversed or, in the alternative, the case should be remanded to the District Court with an order that the District Court direct Appellee to request an Article 15 ruling from the Turkish Court regarding Appellee's custodial rights.

Dated:     New York, New York
             February 21, 2025

                      **BLANK ROME LLP**

                      By: */s/ Brett S. Ward*
                      Brett S. Ward
                      Andrew T. Hambelton
                      1271 Avenue of the Americas
                      New York, New York 10020
                      Tel.: (212) 885-5000

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(b) because it contains 11,412 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

2.      This brief complies with the requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in a 14-point proportionally-spaced serif font.

Dated:      New York, New York
            February 21, 2025

                              **BLANK ROME LLP**

                              By: *<u>/s/ Brett S. Ward</u>*
                              Brett S. Ward
                              Andrew T. Hambelton
                              1271 Avenue of the Americas
                              New York, New York 10020
                              Tel.: (212) 885-5000

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Memorandum and Order, dated December 3, 2024 ... SPA-1

Memorandum and Order, dated January 29, 2025 ..... SPA-18

Judgment, dated February 3, 2025 ............................ SPA-38

SPA-1

## MEMORANDUM AND ORDER, DATED DECEMBER 3, 2024 [SPA-1 - SPA-17]

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
ZUHTU ONUR TATARI,

                              Petitioner,

    -against-

NEVA DURUST,

                             Respondent.

-----------------------------------------------------x

<u>NOT FOR PUBLICATION</u>
**MEMORANDUM & ORDER**
24-CV-6930 (CBA) (SJB)

**AMON, United States District Judge:**

       This case concerns whether O.T., the six-year-old child of Petitioner (Tatari, the father) and Respondent (Durust, the mother), should be returned to Turkey pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11 ("ICARA"). Under those laws, my role at this stage is not to adjudicate the underlying custody dispute between O.T.'s parents, but to determine whether O.T. was wrongfully removed to the United States. 22 U.S.C. § 9001(b)(4); Hague Convention Arts. 3, 16. If he was, I must return him to Turkey, unless Respondent shows one of the recognized exceptions apply. Hague Convention Arts. 3, 12-13. The parties both move for summary judgment. Tatari argues that when Durust brought O.T. to New York to enroll in a new school she violated their Turkish divorce decree ("DD"); Durust believes that the DD allowed her to move O.T. to Brooklyn because she has sole custody. Alternatively, Durust argues I should stay this case to allow the Turkish courts to construe the DD before making my decision. For the reasons that follow, I find that Tatari is entitled to summary judgment on two issues—habitual residence and consent—but not on whether Durust's move to America was wrongful. Durust's motion for summary judgment is denied.

SPA-2

## BACKGROUND

### I.    Family History

These facts are taken from the parties' Local Rule 56.1(a) Statements and Counterstatements (ECF Docket Entry ("D.E.") # 21-1 ("Pet. 56.1"), # 23-2 ("Resp. 56.1"), # 25-1 ("Pet. 56.1 Resp."), and # 26-1 ("Resp. 56.1 Resp.")), the declarations and exhibits filed therewith, (D.E. # 21-2 ("Tatari 1st Decl."), # 23-1 ("Ward 1st Decl."), # 25-2 ("Tatari 2d Decl."), # 26-2 ("Durust Decl."), and # 26-4 ("Ward 2d Decl.")), and Respondent's answer and exhibits filed therewith (D.E. # 17 ("Answer")).    Unless otherwise indicated, the facts in this section are undisputed.    Tatari and Durust were married in Turkey in 2016.    (Pet. 56.1 ¶ 1; Resp. 56.1 ¶ 1.) Their son, O.T., was born in Florida in June 2018.    (Pet. 56.1 ¶¶ 3-4; Resp. 56.1 ¶ 2.)    Shortly after O.T.'s birth, the family returned to Turkey where they lived through spring 2024, except for certain short periods.    (Pet. 56.1 ¶ 5; Resp. 56.1 Resp. 2[1].)    In January 2022, the parties executed a divorce agreement which was approved by the Turkish court.    (Pet. 56.1 ¶¶ 10-11; Resp. 56.1 ¶¶ 5-6.)    The divorce agreement, entered as a court order, is reproduced in Turkish as well as in competing English translations.    (Ward 1st Decl. Ex. C. ("Resp's Tr. DD"); Tatari 1st Decl. Ex. A ("Pet's Tr. DD").)

The DD provides Durust sole custody of O.T. and establishes Tatari's rights to parenting time as well as his obligations to Durust and O.T.    (See Pet. 56.1 ¶ 21; Resp. 56.1 ¶¶ 11-12, 20, 23.)    The parties dispute the correct translation of section 3.7.[2]    Petitioner's translation reads: "Neva DÜRÜST TATARI irrevocably accepts, declares and undertakes that she will obtain the approval and opinion of Zühtü Onur TATARI in case she decides to live abroad with the common

---

[1] Unless otherwise noted, all pagination will refer to internal pagination if available, otherwise ECF pagination.

[2] In Turkish the section reads:  Neva DÜRÜST TATARI, müşterek çocuk ile birlikte yurt dışında yaşamaya karar vermesi halinde Zühtü Onur TATARI'nin onay ve görüşünü alacağını gayri kabili rücu kabul, beyan ve taahhüt eder.

2

child." (Pet's Tr. DD § 3.7.) Respondent's translation reads: "Neva DÜRÜST TATARI irrevocably agrees, represents and undertakes that where she decides to live abroad together with the biological child, she will consult and seek the opinion of Zühtü Onur TATARI." (Resp's Tr. DD § 3.7.) Durust represents that her translation is the official translation provided by the Turkish court that entered the DD. (Resp. 56.1 ¶ 7.) Tatari says that there is no such thing as an official translation provided by the Turkish court, but only private translations of official documents. (Pet. 56.1 Resp. ¶¶ 7-8.)

Around O.T.'s fifth birthday, his United States passport was set to expire. (See Resp. 56.1 Resp. 5; see also D.E. # 17-4.) Tatari refused to sign forms for renewal of the passport, and Durust filed an action in Turkish court to intervene. (Pet. 56.1 ¶ 14; Resp. 56.1 Resp. 5.) Durust, "over Petitioner's strenuous objection," travelled to Ivory Coast in December 2023, where she was able to obtain an emergency United States passport for O.T. (Durust Decl. ¶ 6; Resp. 56.1 Resp. 7.)

In August 2024, Durust and O.T. left Turkey to live in the United States. (Pet. 56.1 ¶ 18; Resp. 56.1 ¶ 24.) Durust did not tell Tatari she planned to relocate O.T. to New York before (or shortly before) moving. (Pet. 56.1 ¶ 20; Answer 13-14; compare Tatari 1st Decl. Ex. C (Durust email telling Tatari she and O.T. will move to New York) with id. ¶ 17 (describing O.T. at the Istanbul airport the day before Durust's email).) Durust explains that she did not directly speak to Tatari about the move because of "the abusive dynamic" between them and her "fear[ that] Petitioner would seek to undermine the Child's admission" to the school in New York. (Answer 13-14.) However, she says that she and Tatari "had many conversations about the possibility of moving to the United States with" O.T. (Resp. 56.1 Resp. 8.) Since then, O.T. has been attending school in New York City. (Tatari 1st Decl. ¶ 18; Resp. 56.1 ¶ 24.)

3

SPA-4

## II.    Procedural History

Tatari and Durust are already parties to several custody disputes in Turkey.  (See Tatari Decl. ¶ 21.)  Two cases are particularly relevant here.  In January 2024, Tatari petitioned the Turkish court for custody of O.T., a petition which is still pending.  (Resp. 56.1 Resp. 4-5.) According to a recent filing, the Turkish court heard testimony from Tatari's witnesses on November 28, and is scheduled to hear from Durust's witnesses on February 7.  (D.E. ## 44, 44-2.)  In September 2024, Durust filed her own petition in Turkish court to determine how Tatari could access O.T. while O.T. was in New York (collectively, "Turkish Proceedings").  (Pet. 56.1 Resp. ¶ 27; Ward 1st Decl. Ex. H 77.)  Tatari responded to Durust's petition in early November, arguing, inter alia, that she is in violation of DD § 3.7.  (Pet. 56.1 Resp. ¶¶ 35-41; Ward 1st Decl. Ex. I § A(7).)

On October 1, 2024, Tatari filed a petition in this Court to return O.T. to Turkey.  He requested that this case be heard on an expedited basis, as required by Article 2 of the Hague Convention.  (D.E. # 1 ¶ 45.)  The parties conducted expedited discovery, anticipating a hearing on December 11 and 12, 2024.  (Minute Entry dated Oct. 10, 2024.)  Both parties have moved for summary judgment.  Tatari's petition urges me to declare that Durust wrongfully removed O.T. from Turkey in violation of the DD and Turkish law.  (D.E. # 21 ("Pet. MSJ").)  In support of that petition, he provides memoranda of law (id.; D.E. # 25 ("Pet. MSJ Rep.")), statements of facts pursuant to Local Rule 56.1 (Pet. 56.1; Pet. 56.1 Resp.), and the following evidence[3]:

- His own declarations of facts (Tatari 1st Decl.; Tatari 2d Decl.);
- His preferred translation of the DD (Pet's Tr. DD);
- Emails between himself and Durust from June 2024 and August 2024 (Tatari 1st Decl. Exs. B and C);
- An order from the Turkish Directorate of Judicial Support and Victim Services dated September 6, 2024 (Id. Ex. D);

---

[3] Both parties submit evidence duplicative of each other's filings as well as earlier filings in this case, which I have considered but do not need to specify here.

- A declaration from Talat Yazici, who translated Respondent's preferred DD translation, explaining that that translation was mistaken (D.E. # 21-4 ("Yazici Decl."));
- A declaration from Ecegül (AJ) Elterman supporting Petitioner's preferred DD translation of § 3.7 (D.E. # 21-5 ("Elterman Decl."));
- An expert report from Mert Yurust, a Turkish lawyer practicing family law, opining on Durust's move to the United States with O.T. under the DD and Turkish law (D.E. # 25-6 ("Yurust Rept.")); and
- An expert report from Burak Huysal, professor of law at Bahcesehir University, opining on the same subject as the Yurust Rept (D.E. # 25-7 ("Huysal Rept.").)

Durust also moves for summary judgment, arguing that her move to the United States with O.T. did not violate Turkish law because it was permitted by the terms of the DD.  (D.E. # 23-3 ("Resp. MSJ") 10-16.)  She also argues that Tatari has not shown that Turkey was O.T.'s habitual residence and that Tatari consented to O.T.'s relocation to America.  (D.E. # 26 ("Resp. MSJ Rep.") 16-21.)  In support of her motion, she provides memoranda of law (id.; Resp. MSJ), statements of facts pursuant to Local Rule 56.1 (Resp. 56.1; Resp. 56.1 Resp.), and the following evidence:

- Her preferred translation of the DD (Resp's Tr. DD);
- Filings from the Turkish Proceedings (Ward 1st Decl. Exs. E-I);
- An expert report from Recai Aytaç Akbay, a retired Turkish judge, opining on Durust's move to the United States with O.T. under the DD and Turkish law (Id. Ex. J ("Akbay Rept."));
- An expert report from Emrehan Inal, professor of law at Istanbul University, opining on the same subject as the Akbay Rept. (Id. Ex. K ("Inal Rept."));
- An expert report from Faruk Kerem Giray, also professor of law at Istanbul University, opining on the same subject as the Akbay and Inal Repts. (Id. Ex. L ("Giray Rept."));
- A declaration from Asli Cavlak supporting Respondent's preferred DD translation of § 3.7 and offering a similar new translation (D.E. # 26-3 ("Cavlak Decl.")); and
- An expert report from Dr. William Kaplan, opining on O.T.'s acclimatization to New York (D.E. # 26-4 ("Kaplan Rept.").)[4]

---

[4] Respondent also requested to supplement the record on summary judgment to include a November 4, 2024 order of the Turkish family court.  (D.E. # 31.)  I will not allow her to supplement the record on summary judgment because she has not shown that "her failure to submit such evidence in a timely fashion was the result of excusable neglect." Desrameaux v. Delta Air Lines Inc., No. 15-cv-347 (CBA) (VMS), 2018 WL 1224100, at *6 (E.D.N.Y. Mar. 18, 2018) (quotation omitted).  She does not deny that she or her Turkish counsel had access to the one-page order on November 4 and does not explain why I should excuse the delay to obtain a translation before her summary judgment reply brief was submitted on November 14.  And even if I were to consider her supplemental evidence, I would not find it relevant because the Turkish court did not rule on the merits of the case.  It instead declined to expedite a hearing on the custody

5

In the alternative, she argues I should dismiss, abstain from, or stay Tatari's petition in favor of the Turkish Proceedings, which she believes will resolve the instant dispute. (Resp. MSJ 16-26.) Petitioner disagrees, arguing that the Turkish Proceeding will not determine whether he has stated a prima facie Hague Convention case and that I may not abstain from hearing this case. (Pet. MSJ 15-18; Pet. MSJ Rep. 12-20.)

## STANDARD OF REVIEW

"Summary judgment is appropriate where the submissions of the parties, taken together, 'show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Gustavia Home, LLC v. Hoyer, 362 F. Supp. 3d 71, 78 (E.D.N.Y. 2019) (quoting Fed. R. Civ. P. 56(a)). "When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration." Id. (citing Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001)). When the moving party shows the absence of a genuine issue of material fact, the opposing party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact," which is "more than simply show[ing] that there is some metaphysical doubt as to the material facts." Bryant v. Steele, 462 F. Supp. 3d 249, 258 (E.D.N.Y. 2020) (quotations omitted). Thus, the opposing party "may not rely on conclusory allegations or unsubstantiated speculation." Id. (quotation omitted).

In considering motions for summary judgment, I may rely only on evidence that would be admissible at trial. Minto v. Molloy Univ., 715 F. Supp. 3d 422, 430 (E.D.N.Y. 2024). The Hague Convention and ICARA modify the ordinary standards of admissibility. In Hague Convention

---

dispute and to order that O.T. be placed in Tatari's custody in the interim because "it is related to the essence of the case and requires a trial." (See D.E. # 44.)

cases, "any petition to a court under section 9003" of Title 22, "or any other documents or information included with such . . . petition or provided after such submission which relates to the . . . petition" do not need to be authenticated to be admissible in court.  22 U.S.C. § 9005; see also Nowlan v. Nowlan, 543 F. Supp. 3d 324, 356-57 (W.D. Va. 2021) (discussing § 9005 and Hague Convention Art. 30).  However, most courts have assumed that the Federal Rules of Evidence otherwise apply to Hague Convention proceedings.  Jacquety v. Baptista, 538 F. Supp. 3d 325, 339 n.8 (S.D.N.Y. 2021).[5]  Relevant here, restrictions regarding hearsay and the admissibility of expert testimony apply.  Id. at 338-39; Nowlan, 543 F. Supp. 3d at 357, 371.  However, expert testimony on foreign law may be considered regardless of its admissibility under the Federal Rules of Evidence.  Fed. R. Civ. P. 44.1; see J.R. Simplot Co. v. McCain Foods USA, Inc., 713 F. Supp. 3d 904, 977 (D. Idaho 2024); see also Branch of Citibank, N.A. v. De Nevares, 74 F.4th 8, 14 & n.5 (2d Cir. 2023).

## DISCUSSION

"The Hague Convention was adopted in 1980 to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . ."  Gitter v. Gitter, 396 F.3d 124, 129 (2d Cir. 2005) (quotation omitted).  It was "especially aimed at the unilateral removal or retention of children by those close to them, such as parents."  Id.  The Hague Convention, implemented through ICARA, provides a right of action to institute judicial proceedings for the return of a child to her habitual residence.  22 U.S.C. § 9003(b).  To compel the return of a child to her habitual

---

[5] Petitioner quotes a First Circuit decision for the proposition that "the summary character of Hague Convention proceedings does not require application of the Federal Rules of Evidence regarding hearsay."  (Pet. MSJ 7 (quoting Danaipour v. McLarey, 386 F.3d 289, 296 (1st Cir. 2004)).)  The First Circuit there was quoting the District of Massachusetts rather than the First Circuit's holding, which expressed some "doubts" as to that proposition.  Danaipour, 386 F.3d at 296.

residence, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." Gitter, 396 F.3d at 130-31 (citation omitted). If a petitioner makes this showing, return is mandatory unless the respondent can show one of the Hague Convention exceptions apply. Souratgar v. Lee, 720 F.3d 96, 102 (2d Cir. 2013). Durust has not affirmatively sought summary judgment on an exception but opposes Tatari's motion on the ground that he consented to O.T.'s removal in the divorce decree. (Resp. MSJ Rep. 18-20.) Tatari seeks summary judgment on each element of his prima facie case as well as on consent.

### I.    Habitual Residence

Tatari urges me to resolve the issue of O.T.'s habitual residence, citing that O.T. has lived in Turkey for six years, with the exception of a few weeks. (Pet. MSJ 7.) Durust even admits in her papers that Turkey was "the country of the Child's habitual residence at the time of the move." (Resp. MSJ 9.) Nonetheless, she argues there is a genuine dispute of material fact as to habitual residence because the Supreme Court has labeled habitual residence "a fact-driven inquiry." (Resp. MSJ Rep. 18 (quoting Monasky v. Taglieri, 589 U.S. 68, 68 (2020)).) She argues that O.T. has become acclimated to America over the last three months. (Id. 19-20.) Her argument fails because habitual residence is set "at the time of removal or retention," here when O.T. came to America. Monasky, 589 U.S. at 77. It is well-recognized that because O.T. lived in Turkey until he was brought to America, Turkey was his habitual residence. Pozniak v. Schwartsman, No. 20-cv-2956 (AMD) (RML), 2021 WL 965238, at *8-9 (E.D.N.Y. Mar. 15, 2021); Lukic v. Elezovic, No. 20-cv-3110 (ARR) (LB), 2021 WL 466029, at *5 (E.D.N.Y. Feb. 9, 2021) (finding habitual

SPA-9

residence in Montenegro at summary judgment where it was "undisputed that [the child] resided in Montenegro for her entire life, up to the point when respondent took her to the United States more than eighteen months ago"). The cases Durust cites concern situations where the wrongful removal or retention is alleged to have occurred subsequent to the move from the habitual residence. (Resp. MSJ Rep. 19, 21); see Grano v. Martin, 443 F. Supp. 3d 510, 530-31, 541 (S.D.N.Y. 2020), aff'd 821 F. App'x 26 (2d Cir. 2020) (child was wrongfully retained in United States under Spanish divorce decree post-dating removal by a year where the parents' last shared intent was for the child to be domiciled in Spain); Spica v. Viera, No. 20-cv-21284-UU, 2020 WL 13401915, at *3-4 (S.D. Fla. June 4, 2020) (discussing whether consensual trip to Florida was a temporary visit or a change in habitual residence). Acclimatization can be relevant in those cases where the child's habituation to the country precedes his wrongful retention there. Pozniak, 2021 WL 965238, at *8-9. In this case, Tatari has shown that the wrongful removal, if any, occurred when O.T. left Turkey. Durust can point to no fact that, prior to that moment, O.T. was habitually resident in the United States. Therefore, summary judgment is appropriate for Tatari's claim that Turkey was O.T.'s habitual residence.

## II.    Wrongful Removal

The parties' main dispute centers on whether O.T.'s removal from Turkey in August 2024 was in breach of Petitioner's custody rights under Turkish law. (Compare Pet. MSJ 10-13 with Resp. MSJ 10-16.) Specifically, the parties dispute whether the Divorce Decree required Durust to obtain Tatari's permission in order to move to New York with O.T. A parent's ne exeat right—meaning the right to prevent the removal of a child from her home jurisdiction—is a custodial right under the Hague Convention if it is recognized under the applicable foreign law. Abbott v. Abbott, 560 U.S. 1, 10-12 (2010). When foreign law does not recognize a ne exeat right (or other custody

right under the Hague Convention), the second element of the prima facie case cannot be shown. Radu v. Toader, 805 F. Supp. 2d 1, 9-11 (E.D.N.Y. 2011), aff'd 463 F. App'x 29 (2d Cir. 2012).

Under historical principles of Turkish law, divorce orders do not provide for joint custody. E.g., Matter of Yaman, 105 A.3d 600, 611 (N.H. 2014) (Turkish law does not permit joint custody in divorce cases); (Inal Rept. ¶ I.3.)  The parent with sole custody has the constitutional right to determine the child's domicile, while the non-custodial parent only has visitation rights.  (Inal Rept. ¶¶ I.5, 7, II.4; see also id. ¶ I.9 (collecting authorities); Yurust Rept. ¶ A.8.)  As stated by the Turkish court whose decision Professor Inal provides, for "the spouse who is the custodial parent . . . taking the child abroad does not, as a rule, require the consent of the spouse from whom she is divorced."  (Inal Rept. ¶ II.4 (quoting Yargitay 2. HD. E.2023/1718).)  Yurust, Petitioner's expert, also agrees to this general principle.  (Yurust Rept. ¶¶ A.8-A.12.)  Following changes in European human rights protocols and a 2017 Supreme Court decision, Turkish courts have begun to enforce at least foreign joint custody orders.  (Yurust Rept. ¶¶ B.1-B6; Inal Rept. ¶ I.3).  Nonetheless, there is no independent procedural vehicle for joint custody under Turkish law.  See C. Agaoglu, Have Turkish Courts started to Enforce Foreign Joint Custody Judgments?, 71 ANNALES DE LA FACULTE DE DROIT D'ISTANBUL 1 (2021) (discussing Turkish enforcement of foreign joint custody orders and the lack of Turkish procedure to implement joint custody).

Against that backdrop, Tatari and his experts argue that the couple tried to make a practical joint custody agreement since Turkish law does not allow them to make an official joint custody agreement.  (Yurust Rept. ¶¶ C.2-C.4; Huysal Rept. ¶¶ 45-46; Pet. MSJ Rep. 10.)  One of the rights that the parties included in their divorce agreement, Tatari argues, is the ne exeat right to veto O.T.'s moving abroad.  (Pet. MSJ 10-13; Pet. MSJ Rep. 7.)  He proffers a translation of the DD,

as well as translators attesting to its language, that suggests that the DD does in fact require Tatari's consent before O.T. can be taken abroad. (Pet. MSJ 10-13.)

Durust disagrees on the correct construction of the DD. She contends that the DD requires her to only to "consult and seek [Petitioner's] opinion" if "she decides to live abroad" with O.T., so the DD did not give Petitioner a veto, and thus no ne exeat right. (Resp. 56.1 ¶ 18; Resp. MSJ 11-14.) This, she claims, fits more in line with the Turkish law described above under which the parent having sole custody may freely move abroad without the permission of the non-custodial parent. (Inal Rept. ¶¶ I.10-12, II.6-7; Resp. MSJ 12.) Additionally, she argues that Tatari's statement during the divorce proceedings that he "understand[s] that [Durust] can legally decide alone within the scope of the right of custody in matters such as . . . moving his residence abroad" shows that section 3.7 of the DD was not meant to alter Durust's privilege under ordinary principles of Turkish law. (See Giray Rept. 3-8; Pet's Tr. DD 2.)

I cannot grant summary judgment on wrongful removal because there is a genuine dispute of material fact. Competing translations are considered genuine disputes of material fact at the summary judgment stage. See Altvater Gessler-J.A. Baczewski Intern. (USA) Inc. v. Sobieski Destylarnia S.A., 572 F.3d 86, 90 n.5 (2d Cir. 2009). Here, the key word in the Turkish DD "onay" has several possible translations including "opinion" and "approval" (see Cavlak Decl. 9; Elterman Decl. 7), and the difficulty of rendering Turkish-language decisions in English is well-documented, see A. Atlay, Difficulties Encountered in the Translation of Legal Texts: The Case of Turkey, TRANSLATION JOURNAL (Oct. 2002), available at https://translationjournal.net/journal/22legal.htm [https://perma.cc/2LJK-3G2T]. Additionally, I cannot resolve the meaning of section 3.7 by resorting to the parties' statements at the divorce proceedings because Tatari's statements are arguably subject to more than one reasonable meaning. (See Resp. MSJ 13); see Adipietro v.

Chubb Life Am., 736 F. Supp. 29 (E.D.N.Y. 1990) (denying summary judgment based on ambiguous stipulation); see also Ruscoe v. Housing Auth. of City of New Britain, 259 F. Supp. 2d 160, 168 (D. Conn. 2003) (interpretation of statements in interview were ambiguous precluding summary judgment).

Tatari also argues that his right to jointly determine O.T.'s schooling and healthcare is independently a custody right under the Convention.  (Pet. MSJ Rep. 8, 10; see Yurust Rept. ¶¶ C.3, C.5, D.3.)  The Hague Convention recognizes as custody rights "right[s] relating to the care of the person of the child."  Takeshi Ogawa v. Kyong Kang, 946 F.3d 1176, 1181 (10th Cir. 2020) (quoting Hague Convention Art. 5).  It is Tatari's burden to prove that, under Turkish law, he has these rights and that they are custodial.  Id.  At this juncture, Tatari has not offered evidence that these rights, standing alone, were custodial under Turkish law.  See White v. White, 718 F.3d 300, 305 (4th Cir. 2013).

For the foregoing reasons summary judgment on whether O.T.'s removal from Turkey was wrongful is not warranted for either party.

**III.    Consent**

Durust also argues that I should "deny Petitioner's Motion because Petitioner consented to the removal of the Child from Turkey to New York by agreeing to terms of the parties' Divorce Decree, which gave Respondent sole custody of the Child and permitted her to move abroad with the Child without requiring Petitioner's approval."  (Resp. MSJ Rep. 18.)  She must show Tatari consented to O.T.'s move to America by a preponderance of the evidence.  22 U.S.C. § 9003(e)(2)(B); Hague Convention Art. 13(a).  "The key to the consent inquiry is the petitioner's subjective intent" prior to removal.  In re Kim, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005).  Courts have also recognized that consent must exist at the time of removal in order to satisfy the Article

13(a) defense.  See Khalip v. Khalip, No. 10-cv-13518 (AC), 2011 WL 1882514, at *6-7 (E.D. Mich. May 17, 2011) (While petitioner "signed the consent application" to move to America after "discuss[ing] the move several times," respondent did not show consent because petitioner clearly revoked consent prior to removal by filing documents in Ukranian court); see also Re G, [2021] EWCA Civ. 139 [24]-[25] (Eng.) [6] (Jackson LJ) ("To be valid, such consent must still be operative at the time of removal.  Consent can be withdrawn at any time before the actual removal.").[7]  She argues that the same DD which allows her to move abroad shows that Tatari agreed for her to take O.T. abroad.  Of course, Tatari disputes that this is what he agreed to in the divorce proceedings. Even assuming Tatari recognized that Durust may move abroad with O.T., he "reserve[d his] right to bring a lawsuit to ensure the alteration (change) of custody unless I am consulted by [Durust] and give my approv[al] as agreed" in the DD.  (Pet's Tr. DD 1.)  And after Durust took O.T. to Ivory Coast over Tatari's "strenuous objection," Tatari did in fact bring a lawsuit to make a change of custody.  (Resp. 56.1 Rep. 4-5, 7.)  Additionally, when O.T.'s American passport was up for renewal, Tatari refused to sign.  (Id. 5.)  Durust even admits that she purposefully did not tell Tatari about her move with O.T. for fear that he would sabotage O.T.'s admission into school.  (Answer 13-14.)  "The deliberately secretive nature of her actions is extremely strong evidence that [Tatari] would not have consented to the removal of" O.T.  Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir. 1996).  All the more so when coupled with Tatari's mentioning of a lawsuit at the divorce hearings and continued objections to international travel.  "Each of the words and actions of a

---

[6] Courts rely on other signatories' courts to interpret the Hague Convention.  Abbott, 560 U.S. at 10-11.

[7] Accord De Casconcelos v. De Paula Batista, No. 4:10-cv-628 (DDB), 2011 WL 806096, at *1, 7-8 (E.D. Tex. Mar. 1, 2011) (not finding consent or acquiescence where petitioner consented to trip to the United States and signed the child's passport but withdrew that consent prior to the child's travel to the United States); Sacchi v. Dervishi, No. 19-cv-6638-SK, 2020 WL 3618957, at *9-10 (N.D. Cal. July 2, 2020) (when petitioner revoked his consent before removal, respondent could not show consent); Rosasen v. Rosasen, No. 19-cv-10742-JFW(AFMx), 2020 WL 12968435, at *12 (C.D. Cal. Mar. 31, 2020) (finding no consent because "even if Mother initially acquiesced in the relocation to the United States in July 2019, the Court has found that Mother withdrew any consent to relocate the Children" prior to removal).

parent during the separation are not to be scrutinized for a possible waiver of custody rights." Id.

The combination of the evidence presented, namely, Tatari's reservation of a right to sue upon

relocation during the divorce proceedings, the exercise of that right in January 2024, and the

subsequent, repeated refusal for O.T. to go abroad, shows that there is no genuine dispute of

material fact that Tatari did not consent for O.T. to move abroad in August 2024 because Tatari

either did not give consent during the divorce proceedings or clearly revoked that consent before

removal.[8] Velozny ex rel. R.V. v. Velozny, 550 F. Supp. 3d 4, 15-17 (S.D.N.Y. 2021) (finding no

consent at summary judgment); Habrzyk v. Habrzyk, 759 F. Supp. 2d 1014, 1025 (N.D. Ill. 2011)

(same); see also Currier v. Currier, 845 F. Supp. 916, 922 (D.N.H. 1994) (finding no consent,

despite divorce agreement, where respondent knew that petitioner was concerned about the

children moving abroad and respondent secretly left the country with the children).

### IV.    Appropriate Forum for Determining Wrongful Removal

I am sympathetic to Durust's argument that the Turkish courts may be the best forum to

resolve the meaning of the DD.  (Resp. MSJ 21-26.)  However, I recognize that resorting to the

Turkish courts will delay the disposition of O.T.'s location, leaving him in limbo against the

Convention's central goal of expediency.  See Chafin v. Chafin, 568 U.S. 165, 180 (2013)

(Ginsburg, J. concurring).  Further, the Turkish Proceedings may not necessarily resolve the instant

Hague Convention petition, a factor counseling against a stay of these proceedings.  See Holder v.

Holder, 305 F.3d 854, 868-69 (9th Cir. 2002) (reversing stay in favor of state court custody

---

[8] "Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense - on which the defendant bears the burden of proof at trial - a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support an essential element of the non-moving party's case." Avail 1 LLC v. Varlas, 680 F. Supp. 3d 265, 272 (E.D.N.Y. 2023) (quoting FDIC v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994)). Tatari sought summary judgment on his Hague Convention case and argued that Durust cannot show her affirmative defense of consent.  (Pet. MSJ 13-15.)  Durust has responded to this argument in her brief, claiming she "can and did establish that Petitioner consented to the Child's relocation to the United States." (Resp. MSJ Rep. 16-18.)  Therefore, summary judgment on consent is appropriate at this stage.

SPA-15

proceedings when it was uncertain that the state court would adjudicate all of the questions in the Hague Convention case).

However, the Hague Convention provides a mechanism to seek a Turkish adjudication of the question of wrongful removal.  Article 15 allows me to "request that the applicant obtain from authorities of the State of the habitual residence of the child a decision or other determination that the removal . . . was wrongful . . .."  Courts have found that resort to an Article 15 request may be appropriate, before or after an evidentiary hearing, especially when there are difficult questions of foreign law.[9]  See Holloway v. Holloway, No. 5:11-cv-30-H, 2011 U.S. Dist. LEXIS 68315, at *14-16 (E.D.N.C. Apr. 14, 2011) (discussing Article 15 request and relying on Bahamian court's decision); Stirk v. Lopez, No. 8:20-cv-2894-SDM-AAS, Order (M.D. Fla. Dec. 17, 2020) (ordering Article 15 request after holding two-day evidentiary hearing); see also In re Application of Adan, 437 F.3d 381, 394 (3d Cir. 2006) (remanding to the district court for proof of custody rights under Argentine law and noting that the District Court has the discretion to make an Article 15 request which "would be very helpful in properly determining the wrongfulness" of the removal).  Although I recognize that an Article 15 request may result in delay, it is possible that the parties can, under Turkish procedure, consolidate an Article 15 request with the pending Turkish Proceedings which, Tatari represents, are mid-trial.  The Turkish courts' familiarity with the parties and their claims may reduce the delay in answering an Article 15 request.  Cf. Bardales v. Lamothe, 423 F. Supp. 3d 459, 473 n.10 (M.D. Tenn. 2019) (declining to order Article 15 request when there were no pending foreign custody proceeding, so the foreign court was unfamiliar with the record).

---

[9] In Turkey, an Article 15 request may be made through the courts.  Hague Conf. on Private Int'l Law, 1980 CHILD ABDUCTION CONVENTION – COUNTRY PROFILE: TURKIYE (2023), available at https://assets.hcch.net/docs/62ed5651-19cc-4d7d-82d4-587832a51873.pdf [https://perma.cc/HTC2-5SXU].

15

SPA-16

At the pretrial conference scheduled in this Memorandum and Order, the parties should come prepared to discuss whether, given the complex issues of Turkish law, I should direct Petitioner to request a determination from the Turkish courts, pursuant to Article 15 of the Hague Convention, that O.T.'s removal from Turkey was wrongful because it violated Petitioner's <u>ne exeat</u> or other custody right.  If it is determined to proceed to the hearing scheduled for December 11 and 12, 2024, rather than delay in favor of the Turkish courts, I expect the parties and their legal experts to come prepared to discuss:

1. Whether a Turkish court may create a <u>ne exeat</u> right in a divorce decree;

2. Whether a Turkish court would interpret the DD to have provided a <u>ne exeat</u> right given the tension in Turkish law cited above;

3. An explanation of the impact of Tatari's second-and-third-to-last sentences in his statement in the DD; specifically:

    a. How a Turkish court would interpret the right to sue Tatari references in the second-to-last sentence, and

    b. How a Turkish court would use Tatari's statement to interpret the DD's provisions; and

4. Whether the healthcare and education provisions in sections 3.4 and 3.8 of the DD gave Tatari custody rights under Turkish law and the Hague Convention.

16

SPA-17

### CONCLUSION

For the foregoing reasons, Tatari's motion for summary judgment is granted as to habitual residence and consent. Durust's motion for summary judgment is denied. A pretrial conference is scheduled for Monday December 9, 2024 at 2:30 P.M. in Courtroom 10D South.

SO ORDERED.

Dated:  December  3 , 2024
Brooklyn, New York

/s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

17

SPA-18

**MEMORANDUM AND ORDER, DATED JANUARY 29, 2025 [SPA-18 - SPA-37]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x
ZUHTU ONUR TATARI,

                          Petitioner,

          -against-                          NOT FOR PUBLICATION
                                             **MEMORANDUM & ORDER**
NEVA DURUST,                                 24-CV-6930 (CBA) (LKE)

                          Respondent.
-----------------------------------------------------x

**AMON, United States District Judge:**

      Before me is the Petition of Zuhtu Onur Tatari pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670 (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001-11 ("ICARA"). Tatari seeks to have his son, O.T., returned to Turkey. I held a two-day bench trial on December 11 and 12, 2024 and received post-trial briefing to resolve a single, seemingly simple question: Whether or not Tatari and his ex-wife Durust's divorce decree ("DD") gave Tatari rights under Turkish law which the Hague Convention recognizes as custodial.

      The issue is not as straightforward as it appears. Although the terms of the Divorce Decree are unambiguous in awarding Tatari certain custodial rights, the terms are in tension with Turkish law that does not formally recognize joint custody. Resolution of this difficult case produces in the societal sense no real winners, especially O.T., who has been displaced once and will be displaced again. Nonetheless, I am required to answer the question. After carefully considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, I make the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a)(1).

SPA-19

### FINDINGS OF FACT

I assume the parties' familiarity with the background facts to this case, which I recounted in my summary judgment opinion. (ECF Docket Entry ("D.E.") # 45 ("SJO") 2-3.) In that opinion, I explained that the parties, who were married in 2016, had O.T. in 2018 and divorced in January 2022. (Id.) I found that Tatari had shown the first element of his Hague Convention case, that Turkey was O.T.'s habitual residence at the time Durust and O.T. moved to Brooklyn. (Id. 8-9.) My determination of the following facts is based on credibility determinations of the witnesses and a careful weighing of competing evidence. Although I generally found the witnesses credible, there were certain isolated incidents in which I did not credit their testimony, which I will note where relevant.

In Turkey, for a married couple to be granted an uncontested divorce, they must present a signed divorce protocol to the court. (Transcript of Trial ("Tr.") 45, 92; D.E. # 64 ("Tatari PTB") ¶ 6); see also Turkish Civil Code ("TCC") Art. 166/3. The Turkish court must review the protocol, hear the parties' statements regarding their decision to divorce and construction of the protocol, and decide whether to adjust any provisions of the protocol. (Tr. 92-94, 295; Tatari PTB ¶ 6); TCC Art. 166/3. Any adjustments by the judge will be recorded in the divorce decree, which then can be approved by the court and the parties. (Tr. 93, 299); TCC Art. 166/3.

In this case, the parties submitted a much-negotiated protocol to the Turkish family court. (Tr. 201-03, 369; Tatari PTB ¶ 7; Pet. Ex.[1] 30 ("Protocol").) Tatari testified that he was especially concerned with the provisions governing visitation, O.T.'s schooling, country of residence, and healthcare. (Tr. 202-06.) Durust testified she was most concerned about having sole custody of O.T. (Id. 347, 369-71.) After hearing the parties' statements and some discussion, the judge

---

[1] Exhibits will be referred to by "Ex.", and consist of Petitioner's trial exhibits ("Pet. Ex."), Respondent's trial exhibits ("Resp. Ex."), and exhibits to previously-filed motions.

modified the visitation schedule slightly, but did not adjust the other provisions of the Protocol. (Id. 211; compare Protocol with Pet. Ex. 29 ("Transperfect DD").[2])  The Protocol was included in the Divorce Decree according to TCC Art. 184/5, and the exclusion of the Protocol's visitation schedule was noted.  (Transperfect DD 2, 5; Pet. Tr. DD 3, 7-8; Resp. Tr. DD 2, 5.)

## I.  The Divorce Decree

The Divorce Decree contains two principal sections.  First, the court summarizes the attorneys' and parties' statements made at the hearing, as well as the judge's findings. (Transperfect DD 1-2.)  Next, it contains a section with the heading "DECISION," followed by seven numbered paragraphs.  (Id. 2-5.)  The fourth paragraph of the Decision contains the Protocol. (Id. 3-5.)  The provisions in Paragraph 4 are identical to the Protocol, even though the judge adjusted the visitation schedule in Paragraph 2 of the DD.  (Compare id. 2-3 with Protocol 1-2.) The parties' translations have somewhat different language describing how the Protocol is incorporated into the DD.  Durust's preferred translation calls the Protocol "approved pursuant to Article 184/5 of TCC and [] deemed an attachment to the order," and later again says that the Protocol is "approved" and "an annex to the court order, pursuant to Article 184/5 of the Turkish Civil Code."  (Resp. Tr. DD 2, 5.)  Tatari's original preferred translation has similar approval and annex language, but his most recent Transperfect translation says the Protocol is "approved . . . in accordance with Article 184/5 of the [TCC], and [is] considered as part of the decision."  (Pet. Tr. DD 3, 7; Transperfect DD 2, 5.)  All the translations reflect that the court approved the remaining articles of the Protocol, the key requirement for the Protocol's validity.  TCC Art. 184/5

---

[2] The parties dispute the accuracy of the various translations submitted.  In this memorandum and order, I will generally refer to the Transperfect DD simply because it is the most clearly reproduced, not because I have determined it is as a whole more or less accurate than other translations.  Courts have required the provision of certified translations, such as the Transperfect DD, to introduce foreign language documents at trial.  See NV Petrus SA v. LPG Trading Corp., No. 14-cv-3138 (NGG) (PK), 2017 WL 1905820, at *2 (E.D.N.Y. May 8, 2017).  Therefore, the three translations in evidence are the Transperfect DD, Pet. Ex. 28 ("Pet. Tr. DD") and Pet. Ex. 22 ("Resp. Tr. DD").

3

("Agreements as to accessory consequences of divorce . . . shall only be valid if they are approved by the judge").

The DD's first section contains the following details. Tatari stated that he accepted the signed protocol and acknowledged that the judge may adjust the terms of it. (Transperfect DD 1.) He understood that "in matters such as making important decisions regarding the child's health and the relocation of their residence abroad, [Durust could] legally make decisions alone under the scope of custody." (Id.)[3] Nonetheless, he "reserve[d] the right to file a lawsuit regarding the change of custody" if Durust "[did] not obtain [his] opinion and approval [in making those decisions] as agreed in the protocol." (Id.) Durust also accepted the signed protocol and acknowledged that the judge may adjust its terms. (Id. 1-2.) She said that she "[would] consider and take into account [Tatari's] opinion and approval, as pledged in the protocol" "in matters such as making important decisions regarding the child's health and the relocation of their residence abroad." (Id. 2.) The judge explained her findings of the appropriateness of a divorce and that "the custody of the joint child is awarded to the mother pursuant to Article 182 of the" TCC. (Id.) She also explained that she was not deciding on any alimony or other financial claims and approved the provisions of the Protocol except for those related to visitation. (Id.)

The next section of the DD describes the decision made by the divorce court. Paragraph 1 of the decision divorced Tatari and Durust. (Id.) Paragraph 2 gives custody of O.T. to Durust and provides the visitation schedule for Tatari. (Id.) Paragraph 3 clarifies that there is no decision made on compensation or alimony. (Id. 3.) Next, Paragraph 4 incorporates the Protocol. The Protocol indicates that Durust will have custody of O.T. and sets out a proposed schedule for

---

[3] Although Tatari testified he did not recall making the statement that is recorded in the Decree, there is no reason to doubt that Tatari said what was recorded in the Decree. Additionally, Durust testified about certain statements the judge made at the hearing, but these are nowhere recorded. (Tr. 347-49, 353.) I do not find her recounting of those details credible and at any rate, they are hearsay.

4

Tatari's visitation.  (Id. 3-4 §§ 3.1, 3.2.)  Section 3.4 of the Protocol dictates that O.T. "will attend schools determined by the mutual decision of the parties throughout [his] educational life, including but not limited to Enka Schools, Hisar Schools, Koc School, Pierre Loti French School, or equivalent schools."  (Id. 4 § 3.4.)  If the school is "determined by the mutual decision of the parties," Tatari is obliged to pay the tuition and fees.  (Id.)  Section 3.5 obligates Tatari to pay for health insurance "as determined by the mutual agreement of the parties."  (Id. 5 § 3.5.)  Section 3.6 obligates Tatari to pay the salary and insurance of O.T.'s caregiver.  (Id. § 3.6.)

At summary judgment, the parties disputed the correct translation of the next provision, Section 3.7.  (See SJO 10-12.)  Although Durust did not press this issue at trial, I will nonetheless resolve it.  (See SJO 10-12.)  Tatari's preferred translations obligate Durust to "obtain the approval and opinion" of Tatari if "she decides to live abroad together with" O.T., while Durust's preferred translation obligates her only to "consult and seek the opinion" of Tatari "where she decides to live abroad together with" O.T.  (Resp. Tr. DD 4; Pet. Tr. DD 6; Transperfect DD 5.)  At trial, Tatari presented two experts, Talat Yazici and AJ Elterman, who testified that his preferred translation was a truer rendition of the original Turkish.  Yazici testified that his original translation, on which Durust relied, was incorrect and that an accurate translation should read Durust "will obtain the approval and opinion" of Tatari.  (Tr. 146-152; Pet. Ex. 40 ¶ 6.)  He said the original translation was mistaken because it made it "seem[] that Neva [Durust] should only take consultation of Onur Tatari" before deciding to move abroad "[b]ut actually she has to take his approval."  (Tr. 153.)

AJ Elterman also testified to the accuracy of Tatari's preferred translation.  She has worked as a legal translator for decades and has been certified for simultaneous translation of Turkish to English by the State Department.  (Id. 168-72.)  She testified that the key Turkish word, "onay," might be used colloquially to mean "okay," but in a formal legal context will always mean

approval.  (Id. 176-77.)  Both experts also noted that in Durust's preferred translation in Section 3.8, the same word "onay" is translated as "approval."  (See Resp. Tr. DD 4.)  Durust offers no explanation for why "onay" would be translated differently here in Section 3.7.  Accordingly, I find that Tatari's preferred translation of Section 3.7 is more faithful to the Turkish original.[4]

Turning to the remainder of the Divorce Decree's recitations in the Protocol, I note that Section 3.8 obligates Durust to "obtain the approval and opinion of" Tatari "when any decision is required with regards to the health status" of O.T.  (Transperfect DD 5 § 3.8.)  Sections 3.9 through 3.11 explain that there is no dispute about dividing property, alimony, or attorney's fees.  (Id. §§ 3.9-3.11.)  In the final terms of the Protocol, the judge added a line to Section 4.2, stating that the "provisions of the protocol dated 01/18/2022, except for those related to personal relationship [visitation], shall be approved in accordance with Article 184/5 of the Turkish Civil Code" and considered as part of or an annex to the decision.  (Id. § 4.2; see Resp. Tr. DD 5; Protocol 4.)  Finally, the last three paragraphs of the decision, which were not part of the submitted Protocol, deal with deposited expenses, fees, and litigation costs.  (Transperfect DD 5.)  The Decree ends by explaining that the "decision was read aloud and explained in accordance with procedure in the presence of the parties and their attorneys," and the right to appeal was explained.  (Id.)

## II.   Subsequent Events

After the divorce, O.T. continued to attend the Papatya school, which the parties had agreed upon before.  (Tr. 215-16, 346.)  At some point, O.T. was also enrolled in a school called "MEF" and ultimately enrolled in Koc, one of the four schools identified in Section 3.4 of the Protocol.

---

[4] I make this finding despite Durust's arguments about Yazici and Elterman's lack of credibility because Yazici offered one translation on which he later reneged, and Elterman only provided a limited review of the translations.  (D.E. # 65 ("Durust PTB") ¶¶ 94-99.)  While Yazici's reversal is notable, Elterman convincingly testified that Section 3.7's translation of "onay" was at odds with its plain meaning of approval in Turkish and with the similar translation in Section 3.8.

6

(Id. 356.) Tatari credibly testified that he was involved in O.T.'s life after the divorce and paid his required support.  (See generally id. 199-231.)  And although Durust at one point filed for an enforcement order for O.T.'s school and activity fees (Resp. Ex. O-1[5]), there was no evidence suggesting that Tatari did not provide and care for O.T.

In the fall of 2023, Durust asked Tatari to sign a consent form to renew O.T.'s American passport, which Tatari refused to do.  (Tr. 230.)  As a result, Durust filed a lawsuit in Turkish court to allow O.T. to receive an American passport without Tatari's signature.  (Id. 231; Resp. Ex. K-1 ("Passport Complaint").)  In her complaint she explained that the American consulate officials would require her to get Tatari's signature even if Durust has sole custody of O.T.  (Passport Complaint 1.)  In December 2023, Durust and O.T. travelled to the Ivory Coast, where she was able to obtain an emergency U.S. passport for O.T. without Tatari's signature.  (Tr. 356.)

Following Durust and O.T.'s return to Turkey, Tatari filed a petition for custody of O.T.  (Id. 227, 242; Resp. Ex. P-1 ("Custody Complaint").)  He also sought a preliminary injunction for custody of O.T.  (Custody Complaint 23.)  The Turkish court rejected his request for a preliminary injunction "since the request is of the essence of the case and requires a trial."  (Resp. Ex. M-3 ("Custody Interim Order") 2.)  In July 2024, Tatari petitioned the Turkish court overseeing the passport case to prevent Durust from taking O.T. abroad and to notify the Turkish and American authorities of this.  (Resp. Ex. N-3 ("July Petition").)  Two days later, the Turkish court denied his request "since the parties were divorced, the mother has custody," and "the party with custody rights may use her rights arising from custody, and moreover, she has the initiative to go abroad."  (Resp. Ex. L-3 ("July Order").)

---

[5] I take judicial notice of foreign court records cited herein that were not presented at trial.  E.g. Giaguaro S.p.A. v. Amiglio, 257 F. Supp. 2d 529, 532 n.1 (E.D.N.Y. 2003) (taking judicial notice of Italian and Canadian complaints and decisions).

On August 20, 2024, Durust flew to America with O.T.  She failed to advise Tatari of the move, much less seek his approval.  The next day, she emailed him indicating her intention to remain in America.  After Durust's move to America, she filed a third action in Turkish court to change Tatari's visitation schedule for O.T. given their move to America, which is currently pending.  (Resp. Ex. F-1.)  Finally, in October 2024, Tatari sought to expedite the custody case in Turkish court, which the family court declined to do.  (Resp. Ex. W-1.)  Nonetheless, Tatari's witnesses were heard in that case on November 28, 2024, and Durust's witnesses are scheduled to be heard in February 2025.  (Resp. Ex. F-3.)

## CONCLUSIONS OF LAW

"The Hague Convention was adopted in 1980 to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ."  Gitter v. Gitter, 396 F.3d 124, 129 (2d Cir. 2005) (quotation omitted).  It was "especially aimed at the unilateral removal or retention of children by those close to them, such as parents."  Id.  The Hague Convention, implemented through ICARA, provides a right of action to institute judicial proceedings for the return of a child to her habitual residence.  22 U.S.C. § 9003(b).  To compel the return of a child to her habitual residence, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."  Gitter, 396 F.3d at 130-31 (citation omitted).  If a petitioner makes this showing, return is mandatory unless the respondent can show one of the Hague Convention exceptions applies.  Souratgar v. Lee, 720 F.3d 96, 102 (2d Cir. 2013).  Durust has not argued that any exception

applies.  At summary judgment, I held that Tatari showed the first element of his prima facie case. (SJO 8-9.)  At the hearing, Tatari testified and showed, and Durust does not dispute, that he was exercising his rights at the time of the removal or would have been exercising those rights but for the removal.  E.g., Mota v. Castillo, 692 F.3d 108, 113 (2d Cir. 2012) (quoting Hague Convention Art. 3(b)).  The sole issue that remains is whether Durust's removal of O.T. from Turkey was wrongful.

The Hague Convention requires the return of a child if their removal is "wrongful," meaning "in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention."  Hague Convention Art. 3(a).  The text of the Convention bifurcates the legal inquiry courts must make. The definitions of wrongfulness and rights of custody are set by the Hague Convention and American caselaw interpreting it, while the substance of the potential rights of custody is determined by the law of the habitual residence, here Turkey.  Ozaltin v. Ozaltin, 708 F.3d 355, 367 (2d Cir. 2013).  What rights Tatari has are thus defined by Turkish law.  The Hague Convention recognizes rights that arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State."  Hague Convention Art. 3.

The official Hague Conference reporter has explained that rights arising "by reason of an agreement having legal effect under the law of that State," can cover even "simple private transactions between the parties concerning the custody of their children."  Elisa Pérez-Vera, Explanatory Report: Hague Conference on Private International Law ¶ 70, in 3 Acts and Documents of the Fourteenth Session, 426, 447 (1982) ("Pérez-Vera Report").[6]  She explains that

---

[6] The Pérez-Vera Report is "an authoritative source for interpreting the Convention's provisions." Tereshchenko v. Karimi, 102 F.4th 111, 133 (2d Cir. 2024) (quoting Gitter, 396 F.3d at 129 n.4).

the Conference originally considered using the term "force of law," but settled on "legal effect" with the intention that the scope of the rights the Convention protects is "as flexible as possible." Id. The Convention therefore recognizes rights arising from agreements which are "not prohibited by" the habitual residence's "law and which may provide a basis for presenting a legal claim to the competent authorities." Id. The United States Department of State has expressed the same view in a notice issued as Congress adopted the Convention. Public Notice 957, 51 Fed. Reg. 10494, 10507 (1986).[7] The Department of State explained that the provision "should be interpreted expansively to cover more than only those agreements that have been incorporated in or referred to in a custody judgment." Id.

The text and interpretation of the Hague Convention control whether the rights Tatari had under Turkish law are custodial. See Lukic v. Elezovic, No. 20-cv-3110 (ARR) (LB), 2021 WL 466029, at *6 (E.D.N.Y. Feb. 9, 2021) (despite the fact that petitioner may not have had a parental right under Montenegrin law, he had a custody right under the Convention because he had a ne exeat right). The Hague Convention recognizes "all the ways in which custody of children can be exercised" and "allows the greatest possible number of cases to be brought into consideration." Abbott v. Abbott, 560 U.S. 1, 19 (2010) (quoting Pérez-Vera Report ¶¶ 67, 71). Finally, whether a removal under the Hague Convention is wrongful is determined based on the treaty's text and interpretation. Ozaltin, 708 F.3d at 369; see also Cunningham v. Cunningham, 237 F. Supp. 3d 1246, 1273-74 (M.D. Fla. 2017).

### I.    Tatari's Rights Under Turkish Law

Durust argues that Tatari only has a right for visitation with O.T., and, because she has sole custody, she has the right to make all decisions about O.T. in her sole discretion. (Durust PTB ¶¶

---

[7] Courts give this notice, as well as the Pérez-Vera Report, consideration in interpreting the Hague Convention. Tereshchenko, 102 F.4th at 134.

88-91, 101, 103.)  Her expert, Professor Inal, testified that under Turkish law courts default to implementing sole custody in cases of divorce.  (Tr. 291.)  Recently Turkish courts have allowed joint custody on the consent of both parents and based on a finding that joint custody is in the child's best interests.  (Id. 292.)  Because joint custody is exceptional, a court imposing it would do so very explicitly and based on a finding of the child's best interests.  (Id. 292-93.)  He further testified that generally the parent having sole custody may make all major decisions for the child without the non-custodial parent's consent, so a divorce decree modifying the decision-making rights of the custodial parent should also do so explicitly and based on a finding of the child's best interests.  (Id. 296-98.)  Professor Inal explained that the provisions of a divorce protocol will not modify the custodial parent's rights because they contain "promises of the parties to each other" rather than judicial orders.  (Id. 298.)  The protocol is approved by the judge in order to provide its validity as "promises of the parties," but in the end, it is just a series of "promises" between the parties, not a judicial order.  (Id. 298-99; see Durust PTB ¶¶ 28, 108, 110, 112, 124-26.)  He argued that this accords with other principles of Turkish law which prohibit the court from imposing certain restrictions on the rights of custodial parents, specifically on the right to go abroad.  (Tr. 297, 301; see Resp. Ex. X-1 ("Inal Rep't") ¶¶ II.3-4.)

Tatari's experts, on the other hand, contend that it is possible to alienate certain custody rights from the parent having sole custody.  Mr. Yalcin explained that in his practice, parties typically approach sharing custody by trying to implement joint custody on certain decisions, like education or health.  (Tr. 100-01; see also D.E. # 25-6 ("Yalcin Rep't") ¶ B.6.[8])  The judge's duty is to analyze each provision of the submitted protocol and she can adjust the protocol to comply

---

[8] Although Mr. Yalcin's expert report was not presented at trial, I may rely on it to aid my determination of foreign law.  HFGL Ltd. v. Alex Lyon & Son Sales Managers and Auctioneers, Inc., 264 F.R.D. 146, 148 (D.N.J. 2009) ("Under Rule 44.1, the Court may consider a foreign law expert report to aid its determination of foreign law, whether or not the report is admissible under the Federal Rules of Evidence.")

with the best interests of the child. (Tr. 101-03.) In order for a divorce to proceed as uncontested, the judge and the parties must agree to the provisions of the divorce and the protocol, which then has legal force. (Id.) In this case, Mr. Yalcin and Tatari's other expert, Professor Huysal, contend that the parties shared custody on the issues of education, healthcare, and country of residence because those provisions were included in the Divorce Decree. (See Tatari PTB ¶¶ 74-75.)

It is clear that the provisions of the Protocol are enforceable in some manner. The provisions of the Protocol were approved by the judge according to TCC Art. 184/5, which provides validity to agreements as to accessorial consequences of divorce upon judicial approval. Because the judge approved the provisions of the Protocol, Tatari has at least some right to the interests established there. Durust does not seriously argue otherwise, nor could she since she sought to enforce Tatari's payment of school tuition and fees, which were only provided for in the Protocol. (Resp. Ex. O-1; see Durust PTB ¶ 108; see also D.E. # 17 at 12 ¶ 21.)

Based on the evidence presented at trial, I find that Tatari has the better argument: Under Turkish law, the provisions of the Protocol—and specifically Sections 3.7 and 3.8—provide Tatari "rights relating to the care of the person of the child." Mr. Yalcin, who is well regarded as an expert in the interaction between the Hague Convention and Turkish custody law,[9] credibly testified that joint custody in divorce has become more common in Turkey over the past decade and a half, especially since a Turkish Supreme Court decision in 2017 which endorsed the practice. (Tr. 90-92, 97; Yalcin Rep't ¶¶ B.3-4.) But because the TCC does not create an independent procedure for establishing joint custody, in practice many couples identify certain rights to exercise

---

[9] Mr. Yalcin is the author of the Chambers and Partners Global Practice Guides for Family Law: Law and Practice in Turkey and Family Law: Trends and Developments in Turkey, see About Mert Yalcin, CHAMBERS, available at https://practiceguides.chambers.com/author/details/0/TWVydCBZYWzDp8Sxbg, as well as the Reuters Practical Law article on Family Law in Turkiye, see Family Law in Turkiye: Overview, THOMSON REUTERS, Oct. 1, 2023, available at https://us.practicallaw.thomsonreuters.com/6-616-4228. He is also a fellow of the International Academy of Family Lawyers, see Mert Yalcin, INT'L ACAD. OF FAM. LAWYERS, available at https://www.iafl.com/find-a-lawyer/search-details/?id=20305.

jointly while granting primary custody to one parent. (Yalcin Rep't ¶ B.6; Tr. 98-99.) Tatari and Durust, in their Protocol, provided the "typical regulation that we put into settlement agreements on the joint custody regulations . . . among the lawyers." (Tr. 100.) Tatari and Durust's Protocol provides that certain rights—specifically those related to education, healthcare, and country of residence—are exercised jointly by the parties. (Id. 101; see also id. 49-52; Yalcin Rep't ¶¶ C.3-C5; Pet. Ex. 45 ¶¶ 37, 45.) Mr. Yalcin explained that divorce by consent is only possible if the judge approves each provision of the protocol, or if the judge makes any changes to the protocol that the parties agree to those changes. (Tr. 92-95.) In this case, the judge adjusted the visitation schedule but otherwise approved the provisions of the Protocol to govern the divorce. (Id. 103-06.) In sum, under the Turkish Divorce Decree Tatari has the right to approve, or disapprove, certain decisions about O.T.'s life, including whether he may live abroad.

Durust and her experts resist this conclusion on several grounds, none of which are persuasive. First, she points to the parties' statements recorded in the Divorce Decree, in which Tatari stated that he understood "that in matters such as making important decisions regarding the child's health and the relocation of their residence abroad, [Durust] can legally make decisions alone under the scope of custody." (Transperfect DD 1; see Durust PTB ¶¶ 100-06.) This, she argues, is more consistent with her explanation of the Divorce Decree: that it did not give Tatari authority to veto her move abroad with O.T. (Durust PTB ¶ 106.)

Tatari counters that the parties' statements are not a binding part of the Turkish decision under Turkish law. (Tatari PTB ¶ 22; D.E. # 66 ("Tatari PTR") ¶ 12.) Although Durust argues that the statements do have some legal import under Turkish law (see Durust PTB ¶¶ 104-06; D.E. # 23-1 Ex. L at 6), it is clear that the divorce judge was not bound by the parties' statements and the Divorce Decree as written is the governing order. (See Tatari PTB ¶¶ 21-26; Durust PTB ¶¶ 26,

13

SPA-31

108.) And under that governing order, the judge implemented the Protocol provisions that granted Tatari rights, including the right to veto O.T.'s move abroad. Tatari's statements at the divorce hearing do not unequivocally negate what the judge ordered because they reference his right to approve or disapprove of O.T.'s relocation and his ability to enforce that right. I do not credit Durust's assertions that the "Judge made Tatari acknowledge" Durust's ability to relocate or that the Judge told Durust "that Section 3.7 was not binding and Tatari did not have the ability to block her from moving abroad with O.T.," neither of which is supported by any record evidence. (Durust PTB ¶¶ 100-11.) Accordingly, I will not depart from the plain language of the Divorce Decree, which provides Tatari the rights explained in Sections 3.4, 3.7, and 3.8.

Durust next argues that the order of the Turkish court overseeing the passport proceedings is more consistent with her explanation of the Divorce Decree. In July, Tatari sought to "prevent the joint child from going abroad without [Tatari] and the court's knowledge" because Durust was "practically abducting [O.T.] abroad" and Tatari "heard that [Durust] plans to take the joint child abroad." (July Petition 2-3.) The Turkish court recognized Tatari's fear that Durust may take O.T. "abroad for short or long periods of time without [Tatari's] knowledge," but denied his request to prevent O.T. from going abroad. (July Order 1.) The court reasoned that "since . . . the mother has custody" she "may use her rights arising from custody" and "has the initiative to go abroad." (Id.; Durust PTB ¶¶ 63-74.) Durust argues that the Turkish court clearly recognized that Durust has the authority to move abroad without Tatari's consent under Turkish law. (Durust PTB ¶¶ 70-74.)

I do not find her argument compelling. First, Tatari argues that the July Order is more limited in scope, merely recognizing that per the Divorce Decree, Durust has the right to travel internationally with O.T., but not to relocate abroad. (Tr. 110-11; Tatari PTB ¶ 62; Tatari PTR ¶¶

14

SPA-32

40-42.)  As such, he did not note Section 3.7 of the Protocol in his filing (see July Petition), and the passport court understood his request as seeking to limit Durust from abusing her right to travel with O.T.  Indeed, Durust testified that she had not decided as of August 20, much less July 10, whether she and O.T. would move to America or just visit there.  (Tr. 382; see also id. 364.)  Second, the Second Circuit has explained that Turkish courts require changes in custody rights to be clear and explicit.  Ozaltin, 708 F.3d at 370.  The Turkish court's brief ruling on two days' notice does not evince a clear order permitting Durust to move abroad without Tatari's consent; instead, it reflects a denial of Tatari's request for extraordinary measures to prevent Durust from travelling.[10]

Finally, Durust argues that Tatari cannot have any rights to make decisions about O.T. because the Divorce Decree grants her sole custody.  She explains that under Turkish law joint custody would be made very explicitly, and in its absence, she has the right to determine O.T.'s residence abroad over Tatari's objection.  (Dursut PTB ¶¶ 115-29.)  But Tatari has not argued that he has formal joint custody; he agrees that Durust has sole custody but argues that the Turkish court modified certain rights to provide Tatari a share in them.  (Tatari PTR ¶ 28.)  As Professor Inal explained, joint exercise of custody is possible in Turkey if the judge explicitly allows for it.  (Tr. 307.)  In this case, the Divorce Decree explicitly grants Tatari the rights listed in the Protocol.

## II.    Hague Convention Categorization of Tatari's Rights

The Hague Convention divides rights a parent may have into two categories:  rights of custody and rights of access.  Hague Convention Art. 5.  Rights of custody include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of

---

[10] I do not need to defer to this opinion of the Turkish court because it was not an application of the Hague Convention, or even an adjudication of an attempt to relocate abroad, and thus it arose under different facts triggering different considerations.  (See Tatari PTR ¶¶ 35-48; cf. Durust PTB ¶¶ 78-87.)

residence," while rights of access "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Id. The Supreme Court has determined that a ne exeat right is a right of custody under the Convention because "determine" can "mean to set bounds or limits to" and a "ne exeat right allows" a parent to ensure their child "cannot live at any street addresses outside of" the country. Abbott, 560 U.S. at 11 (cleaned up). As the Abbott Court explained, the Hague Convention recognizes "all the ways in which custody of children can be exercised" and "allows the greatest possible number of cases to be brought into consideration," including rights such as ne exeat. Id. at 19 (quoting Pérez-Vera Report ¶¶ 67, 71). In contrast, visitation rights are only rights of access and are thus not associated with the ability to make decisions (or limit decisions) about the care of the child. See White v. White, 718 F.3d 300, 304-06 (4th Cir. 2013); see also Pfeiffer v. Bachotet, 913 F.3d 1018, 1024-27 (11th Cir. 2019).

Tatari's right to approve or disapprove decisions about O.T.'s residence, is precisely the type of right the Hague Convention recognizes as custodial. In Abbott, the Supreme Court explained that a ne exeat right was a right to "determine" the child's place of residence because the parent can effectively limit the child's country of residence to only the home country. 560 U.S. at 11. The child's home country may have important influences on the child's absorption of culture and traditions as well as his education. Id. at 11-12. Therefore, a ne exeat right is the sort of custodial right that allows the parent to effect his influence on the child. When a parent's "consent is legally required before the other parent may move the child to another country," that parent has a custodial right to determine the child's residence recognized by law. Radu v. Toader, 463 F. App'x 29, 30 (2d Cir. 2012).

The cases Durust cites do not support her position. In Radu v. Toader, another court in this district found that a removal was not wrongful because the divorce decree in place removed any

ne exeat right that may have existed under background principles of Romanian law when it provided total custody to the respondent. 805 F. Supp. 2d 1, 9-11 (E.D.N.Y. 2011), aff'd, 463 F. App'x at 29. Here, by contrast, the Divorce Decree explicitly grants Tatari a custody right. Likewise, in Pfeiffer v. Bachotet, the father agreed in the operating divorce agreement that the mother may "tak[e] residence abroad [to the] []US or France" with the children, meaning that the "Respondent [had] the exclusive right to determine whether the children would remain in Switzerland or move to the United States or France." No. 18-cv-3446-RWS, 2018 WL 9563334, at *3 (N.D. Ga. Aug. 29, 2018), aff'd, 913 F.3d at 1018. There, despite the petitioner's custody rights under background principles of Swiss law, the divorce order allocated to the respondent "the sole rights of custody as they pertained to determining whether to move the children to the United States." Pfeiffer, 913 F.3d at 1025.

Even if I were to credit Durust's argument that the Divorce Decree only grants Tatari a right to petition the Turkish court for a change of custody if Durust moves abroad with O.T., rather than a right to prevent that move, Tatari would still have a custodial right under the Hague Convention. (Durust PTB ¶¶ 59-62, 76, 102-06, 110-18.) On Durust's reading, the Turkish court approved the Protocol and gave it legal meaning under TCC Art. 184/5, but only as promises between the parties. (Id. ¶ 110.) So, in order to move abroad, Durust was required to get Tatari's approval but had the authority to make the final say to move abroad. Because she had that authority to move abroad despite Tatari's objection, she claims his right to make that objection cannot be custodial.

Persuasive caselaw from other circuits shows that Tatari's ability to object to O.T.'s relocation abroad and present a claim subsequent to that relocation is sufficient to constitute a custodial right. In Palencia v. Perez, the Eleventh Circuit considered an unmarried father's custody

right of <u>patria potestad</u> under Guatemalan law.  921 F.3d 1333, 1339 (11th Cir. 2019).  Guatemalan law provided that all natural parents, whether or not married, have the right and duty to exercise the parental authority of <u>patria potestad</u>, but that when the parents are not married, "the children shall be in the mother's custody."  <u>Id.</u> at 1339-40.  The mother argued that because she had custody over the children, the father could not have an effective <u>patria potestad</u>.  The Eleventh Circuit rejected this conclusion because Guatemalan law "provides an unmarried father with certain obligations (and therefore certain rights) with respect to his child, with the caveat that . . . the mother [has] the final say when the parents disagree on a given issue."  <u>Id.</u> at 1341.  Because the father had the authority to participate in the decision-making about his child's residence, he had a right of custody, despite the fact that the mother had the final say.  <u>Id.</u> at 1342.  Here too, even under Durust's reading of the Divorce Decree, Tatari has the right to participate in making decisions about O.T.'s residence, even if Durust has the final say.

My conclusion is bolstered by a recent case in the Fourth Circuit.  In <u>Aluker v. Yan</u>, the parties executed a divorce agreement pursuant to Virginia law which provided the respondent "sole legal and primary physical custody" of their children and petitioner with "liberal and reasonable visitation" rights.  No. 20-cv-1117, 2021 WL 972885, at *1 (E.D. Va. Mar. 4, 2021).  The petitioner argued that because the divorce agreement was not binding on a Virginia court, it did not have a legal effect to adjust his custody rights under the Convention.  <u>Id.</u> at *4.  The court rejected his argument because Virginia law permits parties to make private custody agreements and considers them to be relevant to structuring divorce decrees.  <u>Id.</u> at *5.  Because the respondent could use this agreement as a basis for presenting a legal claim to Virginia authorities, it had legal effect under the Convention and provided the respondent with full custody.  <u>Id.</u> at *5-6.  The Fourth Circuit affirmed this finding on appeal, reasoning that because the agreement was valid under

18

SPA-36

Virginia law, it was recognizable under the Convention, despite the fact that the agreement would only provide Virginia courts with a starting point to make an ultimate divorce order. Aluker v. Yan, No. 21-1279, 2021 WL 3417968, at *3 (4th Cir. Aug. 5, 2021). Here too, even if Section 3.7 is merely a private agreement between the parties, because it was approved by the Turkish court pursuant to TCC Art. 184/5 and so provides a basis for Tatari to raise a claim in Turkey, it can give rise to a custodial right under the Hague Convention. The Divorce Decree here at least approves the parties' agreement under Turkish law and provides Tatari with a right to say 'no' to O.T.'s relocation abroad and to present a claim to that effect in Turkish court. That right is custodial under the Hague Convention.

SPA-37

## CONCLUSION

Tatari has shown that he had a custodial right, specifically a ne exeat right, under Turkish law which was infringed when O.T. was brought to the United States without his consent.[11] Therefore, I grant Tatari's petition and order that O.T. be returned to Turkey within fourteen (14) days of the date of this Order. The parties are directed to meet and confer to discuss the logistics of O.T.'s return. Upon mutual consent of the parties, the date of O.T.'s return to Turkey can be extended. The Clerk of Court has O.T.'s passport. (See Clerk's Docket Annotations dated Oct. 10, 2024 and Oct. 11, 2024.) Within seven (7) days of this Order, the parties shall file a joint letter advising to whom the Clerk of Court should release the passport. The Clerk of Court is respectfully requested to enter judgment in favor of Petitioner.

SO ORDERED.

Dated: January 29, 2025
Brooklyn, New York

/s/ Carol Bagley Amon
Carol Bagley Amon
United States District Judge

---

[11] I decline to request that Tatari apply to the Turkish authorities for a determination of his custody rights pursuant to Article 15 of the Hague Convention. Mr. Yalcin credibly testified that Turkish courts do not accept Article 15 requests and he had not seen one in Turkey in his years of practice. (Tr. 128-36.) In any event, the Hague Convention's insistence on expediency would not be served by delaying consideration in favor of Turkish authorities when I have received competent expert testimony on Turkish law. See Nunez Bardales v. Lamothe, 423 F. Supp. 3d 459, 473 n.10 (M.D. Tenn. 2019).

SPA-38

**JUDGMENT, DATED FEBRUARY 3, 2025**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
ZUHTU ONUR TATARI,

                      Petitioner,              JUDGMENT

           v.                              24-CV-6930 (CBA) (LKE)

NEVA DURUST,

                      Respondent.
--------------------------------------------------------------X

     A Memorandum and Order of the Honorable Carol B. Amon, United States District Judge, having been filed on January 29, 2025, granting Tatari's petition and ordering that O.T. be returned to Turkey within fourteen (14) days of the date of this Order; and directing the parties to meet and confer to discuss the logistics of O.T.'s return; it is

     ORDERED and ADJUDGED that Tatari's petition is granted; that O.T. is ordered to be returned to Turkey within fourteen (14) days of the date of this Order; that the parties are directed to meet and confer to discuss the logistics of O.T.'s return; that upon mutual consent of the parties, the date of O.T.'s return to Turkey can be extended; that the Clerk of Court has O.T.'s passport. (See Clerk's Docket Annotations dated Oct. 10, 2024 and Oct. 11, 2024.); and that within seven (7) days of this Order, the parties shall file a joint letter advising to whom the Clerk of Court should release the passport.

Dated: Brooklyn, New York                    Brenna B. Mahoney
       February 3, 2025               Clerk of Court

                                By:    */s/Jalitza Poveda*
                                     Deputy Clerk