# 25-253-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

ZUHTU ONUR TATARI,

*Petitioner-Appellee,*

*v.*

NEVA DURUST,

*Respondent-Appellant.*

_____

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF FOR PETITIONER-APPELLEE

Richard Min
Michael Banuchis
GREEN KAMINER MIN
  & ROCKMORE LLP
*Attorneys for Petitioner-Appellee*
420 Lexington Avenue, Suite 2821
New York, New York 10170
212-681-6400


(212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES .......................................................... 4

STATEMENT OF THE CASE .............................................................. 4

    I.   Background and the Divorce Decree ........................................... 4

    II.  Tatari's Article 5 Rights of Custody ......................................... 9

    III. The Abduction and Turkish Court Proceedings ........................ 13

    IV. The District Court's Order ...................................................... 14

SUMMARY OF THE ARGUMENT ................................................... 16

STANDARD OF REVIEW ................................................................. 18

ARGUMENT ..................................................................................... 19

    I.   HAGUE CONVENTION LEGAL STANDARD ..................... 18

    II.  THE INTERIM TURKISH COURT ORDERS
          DO NOT HAVE PRECLUSIVE EFFECT ............................. 22

          A.  The January 2024 Order Did Not Extinguish Tatari's
              *Ne Exeat* Right ............................................................. 24

          B.  The July 2024 Order Did Not Give Durust Permission
              to Permanently Relocate ................................................ 25

          C.  The November 2024 Order Did Not Address Tatari's
              Rights of Custody Under the Hague Convention ............ 26

          D.  The February 2025 Travel Ban Order Undercuts
              Durust's Reliance on Prior Interim Orders .................... 26

E.  The District Court Did Not Overrule Any Decision
    Giving Durust the Right to Relocate O.T. Because
    No Such Order or Right Exists...........................................................27

III. THE DIVORCE DECREE CONFERS RIGHTS
     OF CUSTODY TO TATARI....................................................................30

    A.  The Protocol Has Legal Force Through the Inclusion
        of Its Terms in the Divorce Decree ........................................38

    B.  The Parties' Entered into an Enforceable Agreement
        Under Turkish Law Which Gave Tatari a *Ne Exeat*
        Right ........................................................................................40

IV. THE DISTRICT COURT EXERCISED ITS
    DISCRETION IN NOT APPLYING ARTICLE 15..................................43

CONCLUSION ....................................................................................................47

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)....................................49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott v. Abbott*,
560 U.S. 1 (2010) ........................................................................*passim*

*Altamiranda Vale v. Avila*,
538 F.3d 581 (7th Cir. 2008) ..............................................................35

*Cataphote Corp. v. De Soto Chem. Coatings, Inc.*,
356 F.2d 24 (9th Cir. 1966) ................................................................48

*Chafin v. Chafin*,
568 U.S. 165 (2013) ...........................................................................47

*Diorinou v. Mezitis*,
237 F.3d 133 (2d Cir. 2001) ...............................................................29

*E. Sussex Child. Servs. v. Morris*,
919 F. Supp. 2d 721 (N.D.W. Va. 2013) ...........................................41

*Felder v. Wetzel*,
696 F.3d 92 (1st Cir. 2012) ................................................................46

*Furnes v. Reeves*,
362 F.3d 702 (11th Cir. 2004), *abrogated on other grounds by*,
*Lozano v. Montoya Alvarez*, 572 U.S. 1, 134 S. Ct. 1224,
188 L. Ed. 2d 200 (2014) ............................................................36, 37

*Garcia v. Posada*,
728 F. Supp. 3d 430 (N.D. Tex. 2024), *appeal dismissed*,
No. 24-10319, 2024 WL 4527116 (5th Cir. 2024) ...........................34

*Gatica v. Martinez*,
No. 10-21750-CIV, 2010 WL 6744790 (S.D. Fla. Oct. 13, 2010),
*adopted*, 2011 WL 2110291 (S.D. Fla. May 25, 2011) ....................40

*Gitter v. Gitter*,
396 F.3d 124 (2d Cir. 2005) .................................................18, 20, 21

*Golan v. Saada*,
  596 U.S. 666 (2022) .............................................................................19, 44, 45

*Guzman v. Local 32B-32J Serv. Emps. Int'l Union, AFL-CIO*,
  151 F.3d 86 (2d Cir. 1998)..............................................................................47

*Hanley v. Roy*,
  485 F.3d 647–48 (11th Cir. 2007)...................................................................37

*Holder v. Holder*,
  305 F.3d 854 (9th Cir. 2002).....................................................................23, 43

*Legal Analysis of the Hague Convention on the Civil
  Aspects of International Child Abduction*,
  51 Fed.Reg. 10503 (1986)...............................................................................21

*Leonard v. Lentz*,
  288 F. Supp. 3d 945 (N.D. Iowa 2018),
  *aff'd*, 748 F. App'x 87 (8th Cir. 2019)............................................................41

*Lieberman v. Tabachnik*,
  625 F. Supp. 2d 1109 (D. Colo. 2008)............................................................40

*March v. Levine*,
  249 F.3d 462 (6th Cir. 2001)...........................................................................45

*Miller v. Miller*,
  240 F.3d 392 (4th Cir. 2001)...........................................................................29

*Monasky v. Taglieri*,
  140 S. Ct. 719 (2020) .....................................................................................43

*Mota v. Castillo*,
  692 F.3d 108 (2d Cir.2012).............................................................................18

*Ohlander v. Larson*,
  114 F.3d 1531 (10th Cir. 1997).......................................................................29

*Ozaltin v. Ozaltin*,
  708 F.3d 355 (2d Cir. 2013)............................................................................18

*Palencia v. Perez*,
   921 F.3d 1333 (11th Cir. 2019)............................................................21, 22, 36

*Pawananun v. Pettit*,
   No. 1:20CV1081,
   2020 WL 4462255 (N.D. Ohio Aug. 4, 2020) ...................................23

*Pfeiffer v. Bachotet*,
   No. 18-cv-3446-RWS, 2018 WL 9563334
   (N.D. Ga. Aug. 29, 2018), aff'd, 913 F.3d ...................................42

*Radu v. Toader*,
   805 F. Supp. 2d 1 (E.D.N.Y. 2011)
   *aff'd*, 463 F. App'x 29 (2012) ...................................................16, 42

*Royal Borough of Kensington & Chelsea v. Bafna-Louis*,
   No. 23-470, 2023 WL 6867135 (2d Cir. Oct. 18, 2023) ....................3

*Shalit v. Coppe*,
   182 F.3d 1124 (9th Cir.1999)..........................................................21

*Shealy v. Shealy*,
   295 F.3d 1117 (10th Cir. 2002)........................................................28

*Takeshi Ogawa v. Kyong Kang*,
   946 F.3d 1176 (10th Cir. 2020)........................................................40

*Trott v. Trott*,
   No. 20-CV-1392 (AMD) (CLP),
   2020 WL 4926336 (E.D.N.Y. Aug. 21, 2020)...................................29

*West v. Dobrev*,
   735 F.3d 921 (10th Cir. 2013)..........................................................44

**Statutes**

22 U.S.C. §§ 9001-9011 .....................................................................1

Turkish Civil Code Article 184...................................................*passim*

Turkish Civil Code Article 185...................................................*passim*

Turkish Civil Code Article 339 .............................................................41

Turkish Constitution Article 90 ...........................................................10

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ..................................................3

Hague Convention Article 1(a) ............................................................19

Hague Convention Article 2 ...........................................................20, 43

Hague Convention Article 3 ...................................................18, 28, 46

Hague Convention Article 3(a) ...........................................................20

Hague Convention Article 5(a) .............................................................2

Hague Convention Article 11 .........................................................43, 47

Hague Convention Article 12 ..............................................................19

Hague Convention Article 15 .......................................................*passim*

Travel.State.Gov website, U.S. Department of State-Bureau
    of Consular Affairs, Reports and Data,
    https://travel.state.gov/content/travel/en/International-Parental-
    Child-Abduction/for-providers/legal-reports-and-data.html ...........................46

## PRELIMINARY STATEMENT

The Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (the "Hague Convention" or "Convention"), implemented by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–9011, and the U.S. decisional law interpreting it, is intended to remedy the exact circumstances of child abduction at issue here.

Petitioner-Appellee Zuhtu Onur Tatari ("Tatari") and Respondent-Appellant Neva Durust ("Durust") are the divorced father and mother of the subject child, O.T. (born 2018) (the "Child" or "O.T."). The parties are both Turkish citizens and O.T., who was born in the United States but raised in Turkey, holds Turkish and United States dual citizenship.

Pursuant to the parties' divorce agreement (the "Divorce Protocol"), which was approved by the Turkish court and the terms of which were incorporated into a divorce decree (the "Divorce Decree"), Durust was obligated to obtain Tatari's approval before relocating O.T. outside of Turkey. The Divorce Decree, while granting Durust sole custody, contained several carve outs for joint custodial rights, including for issues related to health, education, and relocation abroad.

Despite the plain terms of the Divorce Decree, on August 20, 2024, Durust secretly relocated O.T. from Turkey to the United States without Tatari's knowledge or consent. At trial, the district court was tasked with analyzing whether Durust's

1

unilateral relocation violated Tatari's rights of custody under the Hague Convention, Article 5(a), because he maintained rights related to the Child's care and residence. The district court heard from witnesses, including experts on Turkish law from both sides, and after a two-day trial, it issued a Memorandum & Order on January 29, 2025 (the "Return Order") granting Tatari's petition.

Durust argued at the trial level and now reiterates that because she has sole custody of O.T., she was permitted to relocate him regardless of the terms of the Divorce Decree, including Tatari's right to veto any international relocation. She also claims that orders issued in the parties' litigation in Turkey resolved the same issues that were before the district court in this case.

Durust overstates the scope of previous interim Turkish court orders, claiming they grant her the right to permanently relocate O.T. abroad even though they never addressed that claim. Notably, after the district court trial, a Turkish order was issued explicitly prohibiting O.T.'s removal from Turkey.

Durust's arguments fail because they conflate distinct legal questions and display a fundamental misunderstanding of the concept of rights of custody in the context of the Hague Convention. A broad body of case law and jurisprudence establishes that a parent with sole custody can still violate the left-behind parent's custody rights if the latter has the right to be consulted on and veto the child's residence. Durust's argument prioritizes form over substance. While she has sole

2

custody of O.T., the Divorce Decree does not grant her unlimited authority to make decisions unilaterally—particularly regarding the child's residence. Instead, the decree includes specific "carve-outs" to her custody award, granting Tatari certain rights over the child's health, education, and relocation abroad.

After considering testimony from both parties and their legal experts, the district court correctly concluded that the plain terms of the Divorce Decree conferred upon Tatari a right to veto O.T.'s international relocation, which is known as a *ne exeat* right[1] – a right Durust violated by unilaterally relocating O.T. to New York. The Supreme Court in *Abbott v. Abbott*, 560 U.S. 1, 10 (2010) held explicitly that a *ne exeat* right is a right of custody under the Hague Convention. This Court should affirm the district court's Return Order and put an end to the ongoing and unequivocal abduction of O.T. from his habitual residence in Turkey.

---

[1] "In the family law context, a *ne exeat* order is '[a]n equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction.' In the family law context, a *ne exeat* order is "[a]n equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction." *Royal Borough of Kensington & Chelsea v. Bafna-Louis*, No. 23-470, 2023 WL 6867135, at *2 (2d Cir. Oct. 18, 2023) citing Black's Law Dictionary (11th ed. 2019).

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly determined that Tatari's rights of custody under Turkish law, including his *ne exeat* right, were violated when Durust secretly and unilaterally relocated the Child from his habitual residence in Turkey to the United States.

2.      Whether the district court had the discretion to request a determination under Article 15 of the Hague Convention and properly exercised that discretion by refusing to do so, given the mandate to resolve Hague matters expeditiously.

## STATEMENT OF THE CASE

### I.      Background and the Divorce Decree

The parties were married in Turkey in January 2016. SA2. O.T. was born in Florida in 2018. *Id.* Shortly after O.T.'s birth, the family returned to Turkey, where they lived until spring 2024. *Id.*

In January 2022, the parties executed a divorce agreement, which was approved by the Turkish court and incorporated into its final Divorce Decree. *Id.* In Turkey, for a married couple to obtain an uncontested divorce, they must submit a signed Divorce Protocol, which outlines the parties' agreement on custody, finances, and property. JA260:6-9. This signed Divorce Protocol is then submitted to the Turkish court for review. The court holds a hearing where the judge reviews the Divorce Protocol and issues a verdict, which may sometimes mirror the signed terms

4

of the agreement or may sometimes modify them. JA258:2-11. If either party is dissatisfied with the judge's decision, they can either convert the case into a contested divorce or appeal the decision, effectively starting the process over. JA259:4-10.

The parties here entered into a Divorce Protocol on January 18, 2022. JA608. Both Tatari and Durust testified that they engaged in several months of negotiations through their attorneys to finalize the terms of the Divorce Protocol. JA368:11; JA534:12-17.

The Divorce Protocol provides Durust sole custody of O.T. while outlining Tatari's visitation rights and his rights and obligations related to custody, as well as his responsibilities toward Durust and O.T. SA2. The most critical aspects of the Divorce Protocol for Tatari were his visitation rights, and his joint decision-making regarding O.T.'s education, where O.T. will live, and healthcare decisions. JA368-69:24-2. These matters were addressed in Sections 3.2, 3.4, 3.7, and 3.8 of the Divorce Protocol. *See* JA608. The parties had been making joint decisions regarding these matters during their marriage, and the Divorce Protocol aimed to continue that arrangement. JA371:24.

Section 3.2 of the Divorce Protocol, which addresses visitation, was adjusted slightly by the Turkish judge in the Divorce Decree[2]. However, the original

---

[2]     At the hearing, the Turkish court slightly modified the parties' agreed upon visitation schedule. SA19-20.

provision contemplated that visitation would take place in Istanbul, Turkey, and required both O.T. and Tatari to be in the same country for its implementation, as did the version modified by the Turkish judge. JA369:17, 23-24; JA377:10-15.

Section 3.4 of the Divorce Protocol establishes joint decision-making regarding O.T.'s education. This aligns with the parties' prior practice of making joint educational decisions, as O.T. was already enrolled in Papatya School when the Divorce Protocol was executed. JA372:4, 10, 12. Section 3.4 also lists top schools in Istanbul, including Enka Schools, Hisar Schools, Koc School, and Pierre Loti French School, as options for O.T.'s future education. JA370:18-24.

Section 3.7 of the Divorce Protocol addresses joint decision-making regarding O.T.'s potential relocation abroad. This provision was especially important to Tatari, who wanted to ensure his continued involvement in O.T.'s life and avoid any risks related to relocation. JA371:8-9.

Although Durust disputed the translation of Section 3.7 and claimed it only required her to consult Tatari before relocating abroad,[3] the district court sided with Tatari's translation. According to the district court, this section required Durust to obtain Tatari's approval before any relocation. SA2-3. The district court reached this

---

[3]     Durust failed to abide by her own created standard as she did not even consult with Tatari prior to the relocation. SA13 ("Durust even admits that she purposefully did not tell Tatari about her move with O.T. for fear that he would sabotage O.T.'s admission into school.") Even based upon this created standard, Durust violated Tatari's rights.

conclusion after hearing testimony from Turkish translators, including one who admitted to misinterpreting Durust's preferred translation. SA23.

Section 3.8 of the Divorce Protocol outlines joint decision-making for healthcare decisions regarding O.T. This is consistent with how the parties made healthcare decisions together prior to the Divorce Protocol. JA373:5. For Tatari, joint decision-making on healthcare was essential to ensure that both parties remained involved in decisions about O.T.'s health. JA371:12.

Tatari testified that he would not have signed the Divorce Protocol if it had not included these key terms, particularly the right to veto relocation as specified in Section 3.7. JA378:1-4.

A hearing in the parties' uncontested divorce case was held on January 19, 2022, and the Divorce Decree was written on February 11, 2022. JA374-75:25-7; JA595. The divorce was finalized on February 15, 2022. JA600.

The Divorce Decree contains two main sections. SA20; JA595-99. The first section summarizes the statements made by the parties and their attorneys at the hearing, along with the judge's findings. *Id.* It is not part of the final Divorce Decree but merely a summary of the oral testimony at the uncontested divorce hearing. *Id.* It is followed by a section labeled "DECISION," which contains seven numbered paragraphs. *Id.* The fourth paragraph includes the Divorce Protocol, which was

approved by the court and deemed "the key requirement for the Protocol's validity."
*Id.*

Durust also acknowledged that she accepted the signed Protocol. SA21. The court approved the Divorce Protocol, except for the provisions related to visitation. *Id.*

The second section of the Divorce Decree outlines the court's decision. Paragraph 1 divorces Tatari and Durust. *Id.* Paragraph 2 grants custody of O.T. to Durust and establishes a visitation schedule for Tatari. *Id.* Paragraph 3 clarifies that no decisions regarding alimony or compensation were made. *Id.* Paragraph 4 incorporates the Divorce Protocol, which establishes that Durust will have custody of O.T. and provides a visitation schedule for Tatari. SA21-22.

Section 3.4 of the Protocol specifies that O.T. will attend schools mutually agreed upon by the parties, with a list of prestigious schools in Istanbul. SA22. Section 3.5 obligates Tatari to pay for health insurance as determined by mutual agreement. *Id.* Section 3.6 requires Tatari to pay the salary and insurance for O.T.'s caregiver. *Id.*

Section 3.7 states that Durust must obtain Tatari's approval and opinion if she decides to live abroad with O.T. SA22-23.

Section 3.8 mandates that Durust obtain Tatari's approval and opinion before making decisions regarding O.T.'s health. SA23. Sections 3.9 through 3.11 address property division, alimony, and attorney's fees, all of which were not in dispute. *Id.*

In the final section of the Divorce Protocol, the judge added a line to Section 4.2, stating that the provisions of the Protocol (except for those related to visitation) would be approved in accordance with Article 184/5 of the Turkish Civil Code and considered part of or an annex to the decision. *Id.*

The last three paragraphs of the Divorce Decree, which were not part of the Divorce Protocol, deal with expenses, fees, and litigation costs. *Id.* The Decree concludes by noting that the decision was read aloud and explained to the parties and their attorneys, and the right to appeal was explained. *Id.* No one appealed. JA271:17-19.

## II.    Tatari's Article 5 Rights of Custody

At trial, the district court heard testimony from legal experts on Turkish law and Tatari's rights under the Divorce Decree. Tatari's experts included Mert Yalcin, an expert recognized for his knowledge of the intersection between the Hague Convention and Turkish custody law (SA29), and Professor Burak Huysal, a Professor of Law in Private International Law at Bahcesehir University in Istanbul, Turkey. JA191:7-9; JA213:19-20. The district court credited the interpretation of Turkish law provided by Tatari's experts. SA28-29.

9

Professor Huysal testified that, although the term "sole custody" was used in reference to Durust in the Divorce Decree, this custody is limited by the joint decision-making powers granted to both parties on specific issues by the Turkish court, as outlined in their Divorce Protocol and as reviewed, approved, and incorporated into the Divorce Decree. These issues include education, relocation, and healthcare. JA598-99.

Professor Huysal confirmed that under Turkish constitutional law, international conventions and legal instruments take precedence over domestic law in cases of conflict. JA209:1. Mr. Yalcin supported this view, explaining that, according to Article 90 of the Turkish Constitution, when there is a conflict between Turkish civil laws and international conventions, the rules of the international convention prevail. JA254-55:22-1. Even Durust's expert conceded that when there is conflict between international instruments and Turkish law, international instruments take priority over domestic Turkish law. JA477:18.

Prior to 2016, Turkish civil law did not provide for joint custody in divorce matters. However, following Turkey's adoption of the European Convention on Human Rights in 2016, joint custody was incorporated into Turkish legal practice. JA207-8:25-3. Mr. Yalcin testified that after 2016, Turkey began applying joint custody regulations in line with the European Convention on Human Rights, making joint custody a part of Turkish domestic law. JA255:6-8, 12-13. He also explained

how joint custody is applied in his own family law practice in Turkey, a point elaborated upon in his expert report. JA255:15-19; JA256-58:22-24.

Section 3.4 of the Divorce Decree specifically grants the parties joint decision-making power concerning education and lists agreed-upon schools, all of which are located in Istanbul, Turkey, thereby giving Tatari a right of custody in the Child's education. JA215:21-24; JA598.

Section 3.7 provides that Durust irrevocably agrees to obtain Tatari's approval and opinion before deciding to relocate abroad with O.T., thereby granting Tatari a right of custody related to the Child's place of residence. JA216:11-17. The right of custody held by Tatari pertains specifically to O.T.'s residence, not to travel or vacations abroad with the Child. JA217-18:22-5.

Section 3.8 mandates that Durust must obtain Tatari's approval and opinion regarding any health decisions for O.T., thus granting Tatari a right of custody in the Child's healthcare. JA599.

Both of Tatari's experts opined that Sections 3.4, 3.7, and 3.8 of the Divorce Decree, which are the incorporated terms of the Divorce Protocol, are enforceable under Turkish law. JA213:19-23; JA268-69:25-1, JA270:17; JA596-99.

Professor Huysal testified that although Durust is designated as the sole custodian in the Divorce Decree, this does not restrict Tatari's rights of custody under the Hague Convention. JA220:14-18. Mr. Yalcin's expert report (JA617)

11

addressed the issues of joint custody in Turkey, Tatari's rights under the Hague Convention, and his custodial rights as outlined in the Divorce Decree. He explained that while Durust holds sole custody in name, the rights conferred in the Divorce Decree provide what amounts to joint custody to Tatari over several areas. JA625. The type of custodial arrangement in the Divorce Decree has become more common in Turkey over the past decade, particularly after Turkey became a part of the European Convention on Human Rights in 2016 (JA255:2-11) and a Turkish Supreme Court decision in 2017 which endorsed the practice. SA29.

Tatari holds rights of custody under Article 5 of the Hague Convention (JA695), particularly concerning education, healthcare, and relocation. JA273-74:19-6, 6-19.

The district court found that Turkish law allows a non-custodial parent, like Tatari, to retain certain custody rights. SA29. The court referenced Mr. Yalcin's testimony, which explained that in his practice, joint custody is often implemented by allowing both parents to share decision-making authority on specific matters such as education and healthcare. SA30.

The district court further explained that the Turkish judge's role is to evaluate each provision of the submitted protocol and may revise it to ensure it serves the best interests of the child. *Id.* Turkish judges are not required to automatically approve the agreements submitted by the parties and may modify the terms. JA260:16-18.

12

The district court found that Tatari held a veto right to prevent O.T.'s relocation abroad, which is a right of custody under the Hague Convention. SA36.

## III.    The Abduction and Turkish Court Proceedings

After the divorce, O.T. continued attending Papatya school, as both parties had previously agreed. SA23. At some point, O.T. was also enrolled in a school called MEF before ultimately enrolling in Koc, one of the four schools listed in Section 3.4 of the Divorce Protocol. *Id.* O.T.'s enrollment in Koc was a mutual decision of the parties. JA598; JA384:17. Tatari remained involved in O.T.'s life post-divorce and fulfilled his required support obligations. SA24. Durust later sought an enforcement order for O.T.'s school and activity fees, but the district court found no evidence that Tatari had failed to provide or care for O.T. *Id.*

In the fall of 2023, Durust asked Tatari to sign a consent form to renew O.T.'s American passport, but he refused. SA24. As a result, Durust filed a lawsuit in Turkish court seeking permission for O.T. to obtain a U.S. passport without Tatari's signature. *Id.* In December 2023, while traveling in the Ivory Coast, Durust obtained an emergency U.S. passport for O.T. without Tatari's signature. *Id.*

After Durust's return to Turkey, Tatari filed a petition seeking custody of O.T. *Id*; JA742. He also requested a preliminary injunction for custody, but the Turkish court denied his request, stating that the issue could only be addressed after a full trial. SA24; JA733.

In July 2024, Tatari petitioned the Turkish court handling the passport case to prevent Durust from taking O.T. abroad and to notify Turkish and American authorities. SA24; JA736. Two days later, the court denied his request, reasoning that since the parties were divorced and the mother had custody, she retained the legal right to travel abroad with O.T. SA24; JA719.

On August 20, 2024, Durust flew to the United States with O.T. without informing Tatari or seeking his approval. SA25. The following day, she emailed him, stating her intention to remain in the United States. *Id.* After moving, she initiated a third legal action in a Turkish court to modify Tatari's visitation schedule to accommodate her unilateral relocation of the Child; this case remains pending. SA25; JA867. In October 2024, Tatari sought to expedite the custody proceedings, but the Turkish family court declined. SA25; JA802. On February 7, 2025, the Turkish court issued an order prohibiting Durust from leaving Turkey with O.T. without Tatari's approval. *See* Motion to Supplement Record [Dkt. No. 37].

## IV. The District Court's Order

On October 1, 2024, Tatari filed his Hague Petition seeking the return of the Child to Turkey. JA11. The district court held an expedited two-day trial on December 11 and 12, 2024. JA8; JA166; JA306. On January 29, 2025, the district court granted the petition and issued the Return Order. SA18.

The district court determined that under Turkish law, as well as Sections 3.7 and 3.8 of the Divorce Decree, Tatari possesses "rights relating to the care of the person of the child." SA29. Because the Turkish Civil Code does not provide an independent procedure for establishing joint custody, couples often designate specific rights to be exercised jointly while granting primary custody to one parent. SA29-30.

The district court found that this practice was reflected in Tatari and Durust's Divorce Protocol, which included what attorneys commonly refer to as "the typical regulation" for joint custody agreements. SA30. The Divorce Protocol explicitly stated that certain rights—specifically those related to education, healthcare, and country of residence—were to be exercised jointly by both parents. *Id.*; JA625-26; JA676; JA679; JA691.

The district court credited Mr. Yalcin's explanation that divorce by consent in Turkey is only possible if a judge approves each provision of the Divorce Protocol or, if modifications are made, both parties agree to those changes. SA30. In this case, the judge adjusted the visitation schedule but otherwise approved the provisions of the Divorce Protocol. *Id.*

Summarizing its findings, the district court concluded that under the Turkish Divorce Decree, Tatari has the right to approve or disapprove significant decisions regarding O.T.'s life, including whether he may live abroad. *Id.*

15

In its analysis of rights of custody under the Hague Convention, the district court determined that Tatari's right to approve or disapprove O.T.'s residence—known as a *ne exeat* right—is precisely the type of right of custody recognized under the Convention. SA33. Citing this Court's decision in *Radu v. Toader*, 463 F. App'x 29, 30 (2d Cir. 2012), the district court applied the concept that "when a parent's 'consent is legally required before the other parent may move the child to another country,' that parent has a custodial right to determine the child's residence recognized by law."

## SUMMARY OF THE ARGUMENT

*First*, Durust overstates the significance of the interim Turkish orders and mischaracterizes the issues presented in this appeal. The Turkish court was never asked to address the specific Hague Convention-related questions before the district court, nor did it ever issue an order authorizing Durust's permanent relocation to New York with O.T. The Turkish court's July 2024 order was narrowly limited to recognizing Durust's right to travel abroad and cannot reasonably be interpreted as approving a permanent move. Durust previously urged the district court—and now urges this Court—to interpret the Turkish orders beyond their clear and explicit terms, mirroring her improper interpretation of the Divorce Decree.

*Second*, the district court correctly concluded that the plain language of the Divorce Decree granted Tatari a *ne exeat* right of custody, thus giving him veto

power over Durust's ability to relocate O.T. internationally. Importantly, this right is independent of whether Durust holds sole custody. Tatari intentionally negotiated the terms of the Divorce Protocol—subsequently incorporated into the Divorce Decree—precisely to prevent Durust from unilaterally relocating their child abroad. Contrary to Durust's assertion, the Turkish court did not issue an unenforceable or meaningless order.

*Third*, the district court's findings regarding Turkish law were entirely consistent with the Turkish Civil Code, the express terms of the Divorce Decree, and expert testimony presented at trial. The court accurately determined that the parties had entered into a custody agreement incorporated into the Divorce Decree, explicitly granting Tatari rights of custody under the Hague Convention, especially concerning decisions related to health, education, and relocation. In accordance with Turkish law, the Divorce Decree explicitly granted Tatari the equivalent of a *ne exeat* right, which Durust subsequently violated. Furthermore, Turkish law recognizes joint custodial rights through its adherence to regulations aligned with the European Convention on Human Rights, thus embedding joint custody into Turkish domestic law. The district court did not invent a novel custody right but simply applied the Divorce Decree's clear, unambiguous terms to address Durust's wrongful relocation of O.T. to New York.

17

*Fourth*, after carefully weighing expert testimony from both parties, the district court reasonably determined that an Article 15 inquiry to the Turkish court was unnecessary. The court credited Mr. Yalcin's testimony indicating that Turkish courts typically do not entertain Article 15 requests and appropriately expressed concern over the delays such a request would entail. SA32, n10.

## STANDARD OF REVIEW

The district court's interpretation of the Convention and its application of the Convention to the facts are reviewed de novo. *Mota v. Castillo*, 692 F.3d 108, 111 (2d Cir.2012). Its interpretations of foreign law are also reviewed de novo. *Ozaltin v. Ozaltin*, 708 F.3d 355, 370 (2d Cir. 2013). The district court's factual determinations are reviewed for clear error. *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005).

The district court's decision not to make an Article 15 inquiry should be reviewed for abuse of discretion. Article 15 of the Hague Convention provides in relevant part that "[t]he judicial or administrative authorities of a Contracting State *may*, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State." (emphasis added). The district court was not under

an obligation to make an Article 15 inquiry, and it declined to do so in an exercise of its discretion and weighing the Convention's goal of expediency.

## ARGUMENT

### I. HAGUE CONVENTION LEGAL STANDARD

The Hague Convention on the Civil Aspects of International Child Abduction "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada*, 596 U.S. 666, 670 (2022) (quoting *Abbott*, 560 U.S. at 8). Its purpose is:

> to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access.

Hague Convention, pmbl.

"The Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan*, 596 U.S. at 670 (internal quotation marks omitted). To further this principle, the Convention "generally requires the prompt return of a child to the child's country of habitual residence when the child has been wrongfully removed to or retained in another country." *Id.* (citing Hague Convention, arts. 1(a), 12). The Convention instructs its contracting states to "take all appropriate measures to secure within their territories the implementation of the

19

objects of the Convention," using "the most expeditious procedures available." Hague Convention, art. 2.

A petitioner must prove three elements to prevail in an action under the Hague Convention for the return of a child: "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir 2005); *see* Hague Convention art. 3(a) (defining the removal or retention of a child as wrongful if it breached rights of custody "under the law of the State in which the child was habitually resident immediately before the removal or retention").

The district court ruled that Turkey is O.T.'s habitual residence on summary judgment. SA9. The third prong of Tatari's *prima facie* case was not disputed.

Germane to Durust's argument here, the Convention provides that the removal or retention of a child is wrongful if "it is in breach of rights of custody." Hague Convention art. 3(a). "Rights of custody" are defined to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* art. 5(a).

The U.S. Supreme Court has held that even minimal parental rights to determine a child's place of residence qualify as "rights of custody" under the

Convention. *Abbott,* 560 U.S. at 10 (2010) ("[T]he Court determines that Mr. Abbott's *ne exeat* right is a right of custody under the Convention.").

The Supreme Court stated in *Abbott* that the Pérez-Vera Report:[4]

> explains that rather than defining custody in precise terms or referring to the laws of different nations pertaining to parental rights, the Convention uses the unadorned term 'rights of custody' to recognize '*all* the ways in which custody of children can be exercised' through 'a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.' (internal citations omitted). Thus the Report rejects the notion that because *ne exeat* rights do not encompass the right to make medical or some other important decisions about a child's life they cannot be rights of custody. Indeed, the Report is fully consistent with the conclusion that *ne exeat* rights are just one of the many "ways in which custody of children can be exercised." (internal citations omitted)."

*Abbott,* 560 U.S. at 19–20.

Notably, "[t]he violation of a single custody right suffices to make removal wrongful." *Palencia v. Perez,* 921 F.3d 1333, 1339 (11th Cir. 2019). Therefore, the district court correctly granted the Petition when it found that Tatari's *ne exeat* right had been violated.

---

[4]     Elisa Perez–Vera was the official Hague Conference reporter, and her explanatory report is "'recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.'" *Shalit v. Coppe*, 182 F.3d 1124, 1127–28 (9th Cir.1999) (quoting Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed.Reg. 10503 (1986)). This Court has recognized it as "an authoritative source for interpreting the Convention's provisions," *Gitter*, 396 F.3d at 130.

## II.    THE INTERIM TURKISH COURT ORDERS DO NOT HAVE PRECLUSIVE EFFECT

The district court did not reverse any decisions made by the Turkish court, and the Turkish court never issued any orders permitting Durust to relocate O.T. The gravamen of Durust's argument is that because she has sole custody of O.T., she could relocate with him regardless of the terms of the Divorce Decree. Durust argues past the district court's reasoning in this regard. The district court noted that Tatari never argued that he has formal joint custody. SA32. While Durust has sole custody of O.T., the Divorce Protocol, negotiated and agreed between the parties, specifically conferred upon Tatari rights, including a *ne exeat* right. *Id.* These terms were then incorporated into the Divorce Decree and ordered by the Turkish court. The fact that Durust has sole custody of O.T. in name only is not dispositive to the issue that was before the district court as her sole custody did not negate Tatari's *ne exeat* right or other rights of custody.

Additionally, Durust argues that an interim order issued by the Turkish court in July 2024, which was limited to addressing Durust's ability to travel abroad with O.T., actually granted her the right to unilaterally and permanently relocate him in direct contravention of the Divorce Decree. SA31. This argument requires an extratextual reading which goes beyond the limited scope of the July 2024 Order.

Durust claims that "[o]n three occasions before the trial in this matter, the Court in Turkey ruled that [Tatari] does not have any custodial rights over the Child."

22

Appellant Br. at 19. This assertion, beyond being irrelevant to this case, is not accurate as the Turkish court never addressed nor was tasked to decide whether Tatari held any rights of custody pursuant to the Hague Convention, including a *ne exeat* right. The issues before the Turkish court were fundamentally different than that before the district court, a distinction Durust repeatedly ignores in her brief.

The Turkish court has not made any ruling regarding Tatari's rights under the Hague Convention. The Ninth Circuit has held that "federal courts adjudicating petitions under the Hague Convention must accord preclusive effect only to those state court judgments ordering or denying the return of a child pursuant to the Hague Convention in an action under ICARA." *Holder v. Holder,* 305 F.3d 854, 866 (9th Cir. 2002); *See also Pawananun v. Pettit*, No. 1:20CV1081, 2020 WL 4462255, at *3 (N.D. Ohio Aug. 4, 2020) (Thai court order which did not resolve Convention petition did not have preclusive effect). The Turkish court never resolved a claim under the Hague Convention and Durust cannot therefore successfully argue that the interim orders resolve the issue of whether Tatari holds custody rights under the Convention. Durust cannot cite any Turkish court order which on its face permits her to relocate O.T. abroad.

## A. The January 2024 Order Did Not Extinguish Tatari's *Ne Exeat* Right

In January 2024, Tatari sought a change of custody from the Turkish Court. JA743. Respondent, taking Petitioner's expert Mr. Yalcin's testimony out of context, claims that:

> Appellee's own expert explained at trial that a change of custody proceeding, like the Custody Case filed by Appellee, is the only process by which a parent *without* custodial rights can challenge the decision making of the custodial parent, including their sole right to relocate abroad. JA285, 231, 619-20"

Appellant Br. at 20.

This is not applicable to the parties or their circumstances in this case. These parties entered into a Divorce Protocol, later incorporated into an enforceable Divorce Decree, which specifically carved out rights of custody for Tatari, including veto power over relocation. Tatari's expert, Mr. Yalcin, testified to this directly and established that Durust has the right to travel with O.T. but not to relocate him over Tatari's objection. JA272:10-11.

Additionally, the Turkish court declining to grant Tatari interim custody pending the parties' custody litigation has no nexus with whether he holds a right of custody under the Hague Convention. This interim decision (JA733) is not an actual determination as to either party's rights of custody and instead states "[a]lthough [Tatari's] attorney requested custody as a precautionary measure, since the request

24

is the essence of the case and requires trial, [Tatari's] request for custody as a precautionary measure is rejected…" [emphasis omitted]. JA733.

### B. The July 2024 Order Did Not Give Durust Permission to Permanently Relocate

Another interim decision in a completely different Turkish case, this time filed by Durust (JA719), is also not determinative as to Tatari's rights of custody or Durust's right of relocation. Tatari's application was meant to address his desire to know the Child's whereabouts following Durust's obtainment of an emergency United States passport for the Child and to prevent her travel with the Child without his knowledge as Tatari had "learned that the trips abroad were made only as a result of the statement in the joint child's school notes, written by [Durust], indicating they were jet-lagged". JA276:19-24; JA720. The order also inaccurately sets forth that "there is no case regarding changing custody", despite the fact that there was a change of custody case filed in a different Turkish court by Tatari in January 2024. JA720; JA742.

Tatari's expert, Mr. Yalcin, addressed the order and testified that it is not an interim order recognizing Durust's right to relocate the Child overseas but rather about travel and the prevention of further travel. JA276:19-24. Durust attempts to frame this interim decision as some kind of determination of Tatari's rights of custody under the Convention when it is clear it is not.

25

### C. The November 2024 Order Did Not Address Tatari's Rights of Custody Under the Hague Convention

The November 2024 Interim Decision (JA802), issued in the custody matter filed by Tatari in January 2024, is also not determinative as to his rights of custody or the issue of relocation. The November 2024 Order simply rejects Tatari's "request to hear the witnesses of both parties at the hearing dated 11.28.2024 due to the heavy schedule of hearings, and to reject the request for custody of the joint child to be given to [Tatari] as a precautionary measure since it is related to the essence of the case and requires a trial." JA803. In other words, the Turkish Court made clear that they would not act, even on a temporary basis, without a trial as the very request at issue was the crux of the pending matter.

Despite her claims, no legal conclusion can be supported by the lack of a formal admonishment against Durust from Turkish Court in the November 2024 Order given their clear directive that trial was necessary to address the underlying application. Nor does the November 2024 Order address rights of custody and as such, cannot be the basis to claim Tatari has no *ne exeat* right.

### D. The February 2025 Travel Ban Order Undercuts Durust's Reliance on Prior Interim Orders

On February 7, 2025, after the Return Order had been issued, the Turkish court issued an order "as a precautionary measure that the parties' minor child, [O.T.]…shall not be permitted to travel abroad without the consent of his father…"

26

(the "Travel Ban"). *See* Motion to Supplement Record [Dkt. No. 37]. Durust's argument that the temporary orders of the Turkish courts are dispositive of her ability to relocate abroad cannot be reconciled with the Travel Ban.

Durust could have, but did not, seek an order from the Turkish court permitting her to relocate. The Travel Ban's issuance makes clear that she did not do so because she was not legally permitted to unilaterally relocate the Child. Further, to the extent that Durust argues that any of the prior interim orders are dispositive, the existence of the Travel Ban undercuts her argument. Durust takes an untenable position which presumes that the Turkish court issued interim rulings eliminating any right of custody to Tatari only to subsequently grant him an interim *ne exeat* order while O.T. was physically located in the U.S.

### E. The District Court Did Not Overrule Any Decision Giving Durust the Right to Relocate O.T. Because No Such Order or Right Exists

Durust's claim that the district court overruled dispositive decisions of the Turkish court mischaracterized the facts and context in which these interim orders were issued. The July 2024 Order was filed in a proceeding concerning passports and not a custody matter. Tatari's application set forth that that Durust "[b]y means of the emergency passport issued…took the joint child abroad for a short or long period of time without the client's knowledge. The client learned about these trips abroad as a result of the statement in the joint child's school notes, written by the

plaintiff, indicating that they were jet-lagged. Again, as we stated in the hearing dated 05.07.2024, the joint child was taken abroad in April 2024 without the client's knowledge." JA737. The phrase in the proffered English translation "taken abroad" is referencing travel and not relocation and as such, the temporary order of the Turkish court hearing the passport application matter is not a dispositive decision on relocation rights. The district court's conclusion that the July 2024 Order was not "an adjudication of an attempt to relocate abroad" is therefore well founded. SA32 n.10.

The district court is not in violation of Article 3 of the Hague Convention for failing to "defer" to the Turkish court's determination of Durust's custody rights because the only custody rights determined by the Turkish court can be found in the Divorce Decree, not in any of the subsequent interim orders. The custody rights of the Divorce Decree clearly provide for *ne exeat* and other custody rights for Tatari.

The cases Durust cites to support her argument are all distinguishable and based on the categorically wrong premise that the Turkish court has issued orders permitting her to relocate. In *Shealy v. Shealy*, 295 F.3d 1117, 1124 (10th Cir. 2002) the court ruled that no rights were violated when a mother removed a child without the father's consent, as she acted in compliance with an interim court order from the child's country of habitual residence which permitted such removal under certain

circumstances. It is not analogous to the instant case since Durust's ability to relocate was contingent on Tatari's approval.

Because no dispositive order or order involving the Hague Convention has been issued by the Turkish court, the cases Durust cites regarding extending comity are likewise inapplicable. In *Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001), for example, the U.S. courts were assessing whether to extend comity to a Greek Hague decision ("we see no basis for declining to defer to the principal ruling in the Greek Hague petition litigation"); *see also Trott v. Trott*, No. 20-CV-1392 (AMD) (CLP), 2020 WL 4926336, at *5 (E.D.N.Y. Aug. 21, 2020) (extending comity to a Bermuda Court of Appeals decision "based on a meticulous review of the record and a well-reasoned application of the Hague Convention"); *Ohlander v. Larson,* 114 F.3d 1531, 1540 (10th Cir. 1997) ("since [petitioner] chose to initiate a second Convention proceeding in Sweden, as Sweden was the jurisdiction where the claims and defenses of both [parties]could be more fairly adjudicated.

Durust also mischaracterizes *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001), a case involving conflicting orders from New York giving the respondent father custody and from Canada giving the petitioner mother custody. First, the case was not decided solely based on the existence of a Canadian custody order. Further, the fact pattern is substantially different as the father removed the Children to the United States in violation of the mother's Canadian custody order. The court used

29

the fact that the mother had a Canadian court custody order as a factor in its determination but nowhere does the decision suggest that its existence was conclusive.

## III. THE DIVORCE DECREE CONFERS RIGHTS OF CUSTODY TO TATARI

Tatari's *ne exeat* right is written into the Divorce Decree. SA34. The fact that Durust has sole custody of O.T. does not negate the existence of Tatari's *ne exeat* right. As the district court acknowledged, Tatari never argued that he had formal joint custody. SA32.

In Turkey, parties typically approach shared custody arrangements by trying to implement joint custody on certain decisions, like education or health. SA28. The Turkish judge analyzes each provision of the submitted protocol and can adjust the protocol to comport with the best interests of the child. SA29.

While the Turkish Civil Code itself does not create an independent procedure for establishing joint custody (SA29; JA256:16-21), different types of joint custody situations have been awarded by Turkish courts since 2016 in compliance with to the European Convention on Human Rights, to which Turkey is a party (JA256-257:19-6; JA262:22). The European Convention on Human Rights, which controls over Turkish domestic law (JA208:11-21), provides for joint custodial arrangements. JA208:1-3.

After 2016, joint custody became an integral part of Turkey's legal principles as the Turkish Supreme Court applied the European Convention on Human Rights. JA263:14-17. Professor Huysal confirmed that Turkish law recognizes joint custody rights, especially when parties agree in a divorce protocol, which aligns with the European Convention on Human Rights, thereby granting joint custodial rights constitutional priority in Turkish law. JA208:5-209:25. Consistent with that point, the Turkish Supreme Court unanimously ruled in 2017 that joint custody arrangements were permitted. JA621. Turkish courts allow for flexible arrangements where the non-custodial parent still participates in important decisions, putting joint custody into practice, although not in name. JA624.

The Divorce Decree gives legal force to the Divorce Protocol's terms providing that certain rights related to education, healthcare, and country of residence are to be exercised jointly by the parties. SA30. The district court credited Tatari's experts who testified that that the parties' shared custody rights on the issues of education, healthcare, and country of residence because those provisions were included in the Divorce Decree.  SA29.  The parties' divorce by consent was only possible because the judge approved each provision of the Divorce Protocol, or, to the extent the judge made any changes to the Divorce Protocol, they were agreed upon by the parties. SA29; JA257-260:14-18.

Both Professor Huysal and Mr. Yalcin in their capacity as experts deemed the incorporated Divorce Protocol terms to be part of the verdict of the Turkish court and enforceable under Turkish law. JA213:19-20; JA268-69:25-1; JA270:17. Given these facts, the district court credited their testimony and found that per the Divorce Decree, "Tatari has the right to approve, or disapprove, certain decisions about O.T.'s life, including whether he may live abroad." SA30.

Durust points to the parties' statements recorded in the Divorce Decree, in which Tatari stated that he understood "that in matters such as making important decisions regarding the child's health and the relocation of their residence abroad, [Durust] can legally make decisions alone under the scope of custody." SA21. She argues that this statement, which is essentially a recital paragraph before the actual provisions of the court order are memorialized, nullified the terms of the Divorce Protocol written into the Divorce Decree. The district court rejected this argument and credited Tatari's expert's opinion that under Turkish law, only the decision portion of the Divorce Decree becomes final and binding. JA213:19-20; JA230:9-10.

The divorce judge was not bound by the parties' statements and the Divorce Decree as written is the governing order. SA32. The district court did not credit Durust's argument, identical to the one made here, that Tatari's statements as recorded in the Divorce Decree served to limit or revoke the plain terms of paragraph

3.7 as that contention was not supported by any evidence.[5] SA31. The district court correctly decided that it "will not depart from the plain language of the Divorce Decree, which provides Tatari the rights explained in Sections 3.4, 3.7, and 3.8." *Id.*

Durust's argument rests on a fundamental misunderstanding of the Hague Convention and particularly the concept of rights of custody under the Convention. Article 5 of the Hague Convention defines rights of custody as "rights relating to the care of the person of the child, and, in particular, the right to determine the child's place of residence." Hague Convention, art. 5.

The Convention neglects to provide a more specific definition; instead, the Convention directs that "rights of custody" are defined according to "the law of the State in which the child was habitually resident" (*Id* at art. 3(a)) or by a custody agreement which has legal effect. As a result, in interpreting the Convention's phrase "rights of custody," the United States Supreme Court instructs lower courts to interpret the phrase "rights of custody" to "recognize 'all the ways in which custody of children can be exercised' through 'a flexible interpretation of the terms used'" allowing for "'the greatest possible number of cases to be brought into consideration.'" *Abbott*, 560 U.S. at 19 (internal citation omitted).

---

[5]     This credibility determination should be reviewed under a deferential clear error standard.

Nowhere in Article 5 or any other section of the Hague Convention is there a requirement that the phrase "joint custody" be used for a party to have a right of custody in the care of the person of a child. *Abbott*, 560 U.S. at 12 (explaining that Convention "forecloses courts from relying on definitions of custody confined by local law usage, definitions that may undermine recognition of custodial arrangements in other countries or in different legal traditions").

The interplay between a respondent having sole custody and the left behind parent's rights of custody in the context of a Hague case was succinctly explained in a case out of the Northern District of Texas:

> A quick aside. One parent getting custody and another getting cohabitation seems at odds with the norm in America, where courts tend to decree in terms of joint custody or order joint managing conservatorships. The Supreme Court in *Abbott* made clear why modern courts struggle with "rights of custody" in Hague Convention cases that don't involve joint custody. Joint custody is a newer concept than the Convention. In a hypothetical case where both parents have joint custody, the left-behind parent still has rights of custody under Hague. Those joint-custody cases are simple. But more historical sole-custody divorces, like the one here, require courts to dig deeper to find if there is some right the left-behind parent has on residence (like the *ne exeat* veto of foreign travel in *Abbott*) or care (like at issue with a variety of Mexican parental authority rights).

*Garcia v. Posada,* 728 F. Supp. 3d 430, 439 (N.D. Tex. 2024), appeal dismissed, No. 24-10319, 2024 WL 4527116 (5th Cir. 2024)

Describing how rights of custody operate under the Hague Convention, the Pérez-Vera Report notes, at 447–48, ¶ 71:

[F]rom the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is . . . wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention . . . seeks . . . to prevent a later decision on the matter being influenced by a change of circumstances.

Synthesizing these concepts, so long as Tatari had the right to veto the Child's relocation, he had a right of custody as understood under the Hague Convention and Durust's relocation was wrongful. Her reliance on having "sole custody" is a misdirection, as it is the actual rights of custody Tatari held which are relevant here. *See e.g. Altamiranda Vale v. Avila*, 538 F.3d 581, 586-7 (7th Cir. 2008) (holding that even though mother had physical custody of child, father had rights of custody because he had right to make decisions about child's care, education, and property).

Relevant case law on this issue has come out of the Eleventh Circuit Court of Appeals, which has cautioned that:

[i]n American courts, we tend to think of custody rights primarily in the sense of physical custody of the child. However, in applying the Hague Convention, we must look to the definition of "rights of custody" set forth in the Convention and not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms. Specifically, in this case we must think of "rights of custody" as including "rights relating to the care of the person of the child," and in particular, "the right to determine the child's place of residence."

*Furnes v. Reeves*, 362 F.3d 702, 711 (11th Cir. 2004), abrogated on other grounds by, *Lozano v. Montoya Alvarez*, 572 U.S. 1, 134 S. Ct. 1224, 188 L. Ed. 2d 200 (2014).

The district court cited *Palencia,* 921 F.3d at 1339 in its recognition of Tatati's rights of custody and the case is instructive. There, the respondent mother argued that because she had sole custody, the father lacked enforceable rights of custody. The Eleventh Circuit rejected this argument, as Guatemalan law conferred specific rights and obligations with respect to his child to the father even though the mother had the final decision-making authority. *Id*. at 1341. Because the father could participate in decisions regarding the child's residence, the court held that he possessed a right of custody under the Hague Convention, notwithstanding the mother's ultimate authority. *Id*. at 1342. Similarly, even under Durust's inaccurate interpretation and translation of the Divorce Decree, Tatari retains the right to participate in decisions concerning O.T.'s residence, regardless of whether Durust has the final authority.

Addressing the concept of rights of custody in *Furnes*, the Eleventh Circuit explained that:

> a parent need not have "custody" of the child to be entitled to return of his child under the Convention; rather, he need only have one right of custody. Further, he need not have a sole or even primary right of custody.

*Furnes*, 362 F.3d at 714.

The Eleventh Circuit has also suggested in dicta that decisions about the child's care "would include everyday decisions about the child's shelter, food, clothing, education, and medical needs." *Id.* at 713.

In applying these principles, in *Hanley v. Roy,* 485 F.3d 647–48 (11th Cir. 2007) the court determined that the petitioners' "status as joint testamentary guardians," which granted them authority "over the children's education, health, and religious life," established that they had rights of custody over the children.

The fact that Durust has sole custody of O.T. is therefore not in conflict with Tatari's right of custody under the Convention to prevent his Child's relocation outside of Turkey. Here, Tatari had not only the right to block O.T.'s relocation, but also to make decisions related to healthcare and choice of school – with jointly agreed to schools specifically named in the Divorce Decree, all of which were located in Turkey. JA598-599.

Tatari therefore had a right to not only veto relocation but also to be a joint decision maker with where O.T. attended school pursuant to Section 3.4 of the Divorce Decree (JA598) and for health decisions for O.T. pursuant to section 3.8 of the Divorce Decree. JA599. These rights of custody fall squarely into those protected by the Hague Convention notwithstanding Tatari's *ne exeat* right.

## A. The Protocol Has Legal Force Through the Inclusion of Its Terms in the Divorce Decree

Durust argues that the district court improperly concluded that Tatari has custodial rights based on the Divorce Protocol. Appellant Br. at 34. This argument is a misdirection, and Durust spends a sizable portion of her brief arguing about the Divorce Protocol when the district court's legal conclusion is grounded on the rights of custody conferred by the Divorce Decree. SA 32 ("the Divorce Decree explicitly grants Tatari the rights listed in the Protocol"). The relevant provisions of the Divorce Protocol, particularly Section 3.7, were approved by the Turkish judge and ordered in the Divorce Decree. SA29. Whether or not the Divorce Protocol standing alone confers rights of custody to Tatari is irrelevant given the Divorce Decree.

The history of Durust's evolving legal arguments in this case provides valuable context here. Originally, she argued that the proper translation of the Divorce Decree required that she need only seek the opinion of Tatari prior to relocating. SA3. Tatari always maintained that the correct translation of the Divorce Decree required her to obtain his approval prior to any move. SA20. Once it became evident that her translation was erroneous, she pivoted to her current argument that the terms of the Protocol, even if incorporated into the Divorce Decree, are not enforceable. Appellant Br. at 34 n.5. This of course assumes that the Turkish judge reviewed and approved unenforceable terms in the Divorce Decree, which has no support in the evidentiary record.

38

The Divorce Protocol is an independent document. JA608. The Divorce Decree incorporates the agreed upon terms present in the Divorce Protocol "which Tatari has the right to approve, or disapprove, certain decisions about O.T.'s life, including whether he may live abroad." SA30.

The Divorce Decree (JA596) indicates that the decision portion begins under Section I, with the subheading "DECISION: For the reasons described above:" (JA213:22-23). The terms of the Divorce Protocol, including Sections 3.4, 3.7, and 3.8, are explicitly set forth beneath this subheading (JA596-99).

Durust fails to present any logical reason why she and Tatari, along with their lawyers, would spend months negotiating terms that supposedly have no meaning (JA538:5). Even her proposed translation reinforces this point, as Section 2 states, "It was ORDERED, ADJUDGED, and DECREED," followed by the Protocol as one of the paragraphs listed below.

Crucially, she also fails to reconcile her position with the existence of Section 4.2 under the decision subheading of the Divorce Decree. This section, partially in bold, explicitly states: "The provisions of the protocol dated 01/18/2022, except for those related to personal relationships, shall be approved in accordance with Article 184/5 of the Turkish Civil Code and considered part of the decision" (JA596).

In cases involving foreign divorce decrees or custody agreements, the unambiguous text of the decree or agreement provides the reviewing court with a

clear answer. *See Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1118 (D. Colo. 2008) (where the parties' agreement in the decree provided that "[b]oth parties shall have the paternal authority of their minor children," father maintained rights of custody even though mother had custody of the children); *Gatica v. Martinez*, No. 10-21750-CIV, 2010 WL 6744790, at *2–3 (S.D. Fla. Oct. 13, 2010) (unpublished report and recommendation) (decree did not extinguish father's rights of custody despite mother having custody because the decree provided that "[b]oth parties agree to retain parental authority"), adopted, 2011 WL 2110291 (S.D. Fla. May 25, 2011) (unpublished order); *cf. Takeshi Ogawa v. Kyong Kang*, 946 F.3d 1176, 1178, 1180 (10th Cir. 2020) (father lacked rights of custody because the decree explicitly awarded only mother parental authority, which, under Japanese law, included the right to determine the child's place of residence). The plain language of the Divorce Decree creates what is for all practical purposes a *ne exeat* right for Tatari and the issue of whether the Protocol also confers rights of custody is irrelevant.

### B. The Parties' Entered into an Enforceable Agreement Under Turkish Law Which Gave Tatari a *Ne Exeat* Right

Durust's argument that *ne exeat* rights do not exist under Turkish law has no legal basis or evidentiary support. She simply repackages her argument that she has sole custody, and that Tatari has no rights of custody to O.T. regardless of the terms of the Divorce Decree. The important concept here is the right conferred rather than the exact legal term. Tatari's right of custody is granted by the language of the

40

Divorce Protocol, as incorporated into the Divorce Decree, which is the equivalent of a *ne exeat* right, even if it was not explicitly called a *ne exeat* right in the Divorce Protocol or Divorce Decree.

Tatari's *ne exeat* right is a legal carve out to Durust's sole custody. It has legal force as it was approved and incorporated by the Turkish court. There is no need for there to be a statutory *ne exeat* right in Turkish law for the terms of the Divorce Decree to confer what is in effect a *ne exeat* right to Tatari. *Abbott*, 560 U.S. at 10-15 held specifically that a court-issued *ne exeat* order can establish a right of custody under the Convention.

Durust is also incorrect that Turkey does not recognize a *ne exeat* right. *See Leonard v. Lentz*, 288 F. Supp. 3d 945, 956 (N.D. Iowa 2018), aff'd, 748 F. App'x 87 (8th Cir. 2019) ("Article 339 of the Turkish Civil Code creates a right for a parent to prevent a child's removal from the house and further provides that a child cannot be taken away without a legal reason. This right extends to allow a parent to withhold consent for a child to be removed from Turkey.")

In *Leonard*, 288 F. Supp. at 953, which cited Mr. Yalcin's work in finding that *ne exeat* rights existed in Turkey, the district court found that a Turkish court's *ne exeat* order issued during the pending custody litigation conferred a right of custody to the petitioner. *See also E. Sussex Child. Servs. v. Morris*, 919 F. Supp.

2d 721, 731 (N.D.W. Va. 2013) (court finds that English court orders created a *ne exeat* right).

Durust's reliance on *Radu v. Toader*, 805 F. Supp. 2d 1, 9-11 (E.D.N.Y. 2011) aff'd, 463 F. App'x at 29 is misplaced. There, the district court found that a removal was not wrongful because the divorce decree in place removed any *ne exeat* right that may have existed under background principles of Romanian law when it provided total custody to the respondent. Here, the Divorce Decree unequivocally grants Tatari certain legal rights to the Child, which are rights of custody.

Likewise, her reliance on *Pfeiffer v. Bachotet*, No. 18-cv-3446-RWS, 2018 WL 9563334, at *3 (N.D. Ga. Aug. 29, 2018), aff'd, 913 F.3d at 1018 is also misplaced. There, the father agreed in the divorce agreement that the mother may "tak[e] residence abroad [to the] [ ]US or France" with the children, meaning that the "Respondent [had] the exclusive right to determine whether the children would remain in Switzerland or move to the United States or France." There, despite the petitioner's custody rights under background principles of Swiss law, the divorce order allocated to the respondent "the sole rights of custody as they pertained to determining whether to move the children to the United States." *Pfeiffer*, 913 F.3d at 1025.

In contrast here, Durust and Tatari specifically agreed to the condition of Tatari's approval for any relocation abroad pursuant to the Divorce Protocol

incorporated into the Divorce Decree. The district court relied on instructive case law from other circuits in reaching its determination that Tatari's ability to object to O.T.'s relocation abroad and to assert a legal claim following such relocation constitutes a right of custody under the Hague Convention.

Durust again misapprehends the law in contending that Tatari's only recourse for Durust's unilateral relocation of O.T. was to file for a change of custody in Turkey. Appellant Br. at 41. There was no evidence presented, and Durust does not even contend, that the Turkish Civil Code precludes Tatari from seeking relief under the Hague Convention in the United States. His recourse in Turkey is a matter of Turkish procedure unrelated to his rights of custody under the Convention. The United States federal court's jurisdiction to adjudicate Hague cases is not curtailed by the procedural legal recourse available to Tatari in Turkey.

## IV. THE DISTRICT COURT EXERCISED ITS DISCRETION IN NOT APPLYING ARTICLE 15

The Hague Convention mandates that courts "use the most expeditious procedures available." *Monasky*, 140 S. Ct. at 724 (*citing* Hague Convention, arts. 2, 11); *Holder,* 305 F.3d at 871 (noting that order and efficiency concerns in resolving actions under the Hague Convention should be subordinated to the Convention's requirement in Articles 2 and 11 that courts expeditiously resolve claims).

In recognition of this cornerstone principle of the Hague Convention, numerous appellate courts throughout the country recognize that district courts reviewing Hague Convention cases must have the discretion to address the dual concerns of expeditiously resolving claims and protecting the parties' due process interests. This permits flexibility in the procedures utilized to achieve these dual aims.

In *Golan v. Saada*, 596 U.S. 666, 681 (2022), the Supreme Court stated that "[t]imely resolution of return petitions is important in part because return is a 'provisional' remedy to enable final custody determinations to proceed." It also cautioned to ["remember, the Convention requires courts to resolve return petitions us[ing] the most expeditious procedures available and to provide parties that request it with an explanation if proceedings extend longer than six weeks" and that [c]ourts should structure return proceedings with these instructions in mind." *Id*. at 682 (internal citations omitted). In the instant case the Turkish court is actively issuing orders in anticipation of O.T.'s return and there is no reason to cause further delay. *See* Motion to Supplement Record [Dkt. No. 37].

To that end, trial courts have considerable discretion in determining the scope of Hague Convention proceedings, including the scope of evidence received and the use of summary adjudication or other expedited procedures. *See, e.g., West v. Dobrev*, 735 F.3d 921, 932 (10th Cir. 2013) ("[A] meaningful opportunity to be

44

heard . . . is all due process requires in the context of a Hague Convention petition."); *March v. Levine,* 249 F.3d 462, 474 (6th Cir. 2001) ("There is no requirement under the Hague Convention or under the ICARA that discovery be allowed or that an evidentiary hearing be conducted.")

Durust argues that the court erred in declining to apply Article 15 of the Hague Convention. She bases this argument on the fact that Tatari's expert, Mr. Yalcin, testified that in Turkey there have been no Article 15 applications to date per the Central Authority, was incorrect. Appellant Br. at 46.

The district court did not abuse its discretion by refusing to make an Article 15 inquiry which would cause further delay when there was sufficient information in the record to make a determination without turning to the Turkish court. The district court has the discretionary ability to balance expediency concerns in adjudicating Hague petitions. *See Golan* v. Saada, 596 U.S. at 682. The district court was confident that it had sufficient evidence regarding Turkish law to render a decision without requiring the attendant delay of an Article 15 determination. SA37, n. 11.

Article 15 of the Hague Convention provides in relevant part that "[t]he judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other

45

determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State." *Felder v. Wetzel*, 696 F.3d 92 at n8 (1st Cir. 2012). While a district court may have requested Tatari to obtain such a ruling from Turkey, Article 15 of the Convention does not demand a court to do so.

Durust further argues that the district court's conclusion that relied on Mr. Yalcin's testimony is "undermined by Turkey's country profile on the Hague Conference on Private International Law" that purports that Turkey can issue Article 15 decisions. Appellant Br. at 45. Notwithstanding, Durust conveniently fails to note the delay which would result from the district court requesting an Article 15 determination from Turkey. "The International Child Abduction Prevention and Return Act (ICAPRA) requires the Department to submit an Annual Report on International Child Abduction to Congress by April 30."[6] The Annual Report submitted in 2024 states that "[w]hile the Department did not cite [Turkey] for demonstrating a pattern of noncompliance in 2023, the Department is concerned about delays in the judicial process and concurrent custody cases." Further, it was noted that "[d]elays by the Turkish judicial authorities at both the first instance and appellate levels impacted cases during 2023" and [t]he Department will continue

---

[6] https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data.html.

46

intense engagement with the Turkish authorities to address issues of concern." *Id.* at 203.

Therefore, the district court did not abuse its discretion in declining to request an Article 15 determination from Turkey. First, although the Central Authority may acknowledge that such determinations are theoretically possible, they are exceedingly rare, to the extent that a seasoned practitioner has never encountered one. JA296:16-18. Second, it is apparent that the U.S. Department of State has expressed concerns regarding the significant delays in the Turkish judicial process, which undermines the very premise of the Convention. Hague Convention, art. 11 (encouraging courts to rule on petitioners within six weeks). "Protraction ... is hardly consonant with the Convention's objectives." *Chafin v. Chafin*, 568 U.S. 165, 185 (2013). Waiting for an Article 15 ruling in this instance would therefore defeat the objectives of the Convention.

## CONCLUSION

Durust secretly abducted the Child in the midst of an ongoing custody dispute in Turkey. The sort of scenario now before this Court is the precise reason why the Hague Convention exists. Abducting and wrongfully retaining a child in the United States is not the appropriate means to relocate a child.

Durust is not entitled to "an opportunity to retry the case*." Guzman v. Local 32B-32J Serv. Emps. Int'l Union, AFL-CIO*, 151 F.3d 86, 91 (2d Cir. 1998). The

47

function of the appellate court "is not . . . to reevaluate the evidence presented below [or] substitute [its] judgment for the first-hand evaluation made by the trier of fact[,]" but rather "to determine if there exists evidence of substance to support the findings of fact of the trial court." *Cataphote Corp. v. De Soto Chem. Coatings, Inc.*, 356 F.2d 24, 26 (9th Cir. 1966).

For the foregoing reasons it is respectfully requested that this Court affirm the Return Order.

Dated: March 7, 2025

Respectfully submitted,

/s/ Richard Min
Richard Min
Michael Banuchis
GREEN KAMINER
 MIN & ROCKMORE, LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
(212) 681-6400
rmin@gkmrlaw.com

*Counsel for Petitioner-Appellee*
 *Zuhtu Onur Tatatri*

48

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,159words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: March 7, 2025

Respectfully submitted,

/s/ Richard Min
Richard Min
Michael Banuchis
GREEN KAMINER
MIN & ROCKMORE, LLP
420 Lexington Avenue, Suite 2821
New York, NY 10170
(212) 681-6400
rmin@gkmrlaw.com

*Counsel for Petitioner-Appellee*
 *Zuhtu Onur Tatatri*